**CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL, Plaintiff,**

v.

**INTERSTATE NON–FERROUS CORPORATION et al., Defendants.**

**And Related Cross and Counter–Claims**

**No. CIVF97–5016 OWW LJO.**

United States District Court, E.D. California.

July 28, 2003.

Susan S Fiering, Attorney General's Office of the State of California, Oakland, CA, for Department of Toxic Substances Control.

Ross Harris Hirsch, Stanzler Funderburk and Castellon, Los Angeles, CA, Ruben A Castellon, Stanzler Funderburk and Castellon, San Francisco, CA, for Barstow Truck Parts and Equipment Co., Inc.

Ray L Wong, Hancock, Rothert and Bunshoft, San Francisco, CA, Laura D Cason, Cason and Associates, Pleasant

Hill, CA, Sean Daniel White, Archer Norris, Walnut Creek, CA, for Estate of William C. Huffman.

Richard Anson Lense, Law Office of Richard Anson Lense, El Segundo, CA, for Rola Metal Co., Inc.

Meryl Macklin, Cohen and Grigsby, Pittsburgh, PA, for GTE California Inc.

David Reynolds, Lewis Brisbois Bisgaard and Smith, Los Angeles, CA, for Kawabata Refining, Kawabata American, Inc.

Kurt Weissmuller, Weston Benshoof Rochefort Rubalcava and MacCuish, Los Angeles, CA, for Rockwell Intern. Corp., Aminoil USA, Inc., Mobil Oil Corp., Shell Oil Co., Raytheon Co.

Hal Segall, Beveridge and Diamond, Washington, DC, Tom Haynes, Sun Company Inc Law Dept, Philadelphia, PA, David A Ossentjuk, Jackson DeMarco and Peckenpaugh, Westlake Village, CA, for Sun Oil Co.

Lisa Annette Binder, Latham and Watkins, Los Angeles, CA, for Swenson Metal.

Louis A Sterns Sr, Northridge, CA, for Mark Thompson.

Cynthia L Burch, Munger Tolles and Olson, Los Angeles, CA, for Union Pacific Resources Co.

Mark Stephen Gordon, Anaheim, CA, for Anaheim City.

David A Ossentjuk, Jackson DeMarco and Peckenpaugh, Westlake Village, CA, for Oryx Energy Co.

Nancy J Casale, Cooper White and Cooper, Walnut Creek, CA, for Levin Enterprises.

Kevin Gerald McCluskey, Waters McCluskey and Boehle, Los Angeles, CA, for Steverson Bros, Atlas Iron and Metal.

Carolyn Ann Barnes, Burbank, CA, for City of Burbank.

Peter J Gutierrez, Office of The County Counsel, Los Angeles, CA, for Los Angeles County.

Herbert Norman Wolfe, Herzog Fisher and Grayson, Beverly Hills, CA, for Distributers Unlimited.

Laura D Cason, Cason and Associates, Pleasant Hill, CA, Sean Daniel White, Archer Norris, Walnut Creek, CA, for Ohio Cas. Inc. Co.

William J King, Graves and King, Glendale, CA, for San Fernando Motors.

Nelson E Brestoff, Moskowitz Brestoff Winston and Blinderman, Los Angeles, CA, for Herman Berkovics.

Terrance Anderson, Sherman Oaks, CA, for Joe's Scrap.

Matthew F Lintner, Attorney General's Office of the State of California, Oakland.

S Randall Humm, United States Department of Justice, Land and Natural Resources Division, Washington, DC.

W Eric Blumhardt, Archer McComas Breslin McMahon and Chritton, Walnut Creek.

John F Barg, Barg Coffin Lewis and Trapp LLP, San Francisco.

Sean Daniel White, Archer Norris, Walnut Creek.

Roberta Scharlin Zinman, Los Angeles Dept of Water and Power, Los Angeles, CA, for Los Angeles Dept. of Water and Power.

Mark Robert Warnke, Cooper White and Cooper, Walnut Creek, CA, for Levin Metals Corp.

Timothy J Hogan, Camarillo, CA, for the Purdy Co.

Lawrence S Newberry, Pasadena City Attorneys Office, Pasadena, CA, for Pasadena City.

Christina R Sansone, City Attorney's Office, Glendale.

Arthur B Fine, Mitchell Silberberg and Knupp, Los Angeles.

Ruben Castellon, Stanzler Funderburk & Castellon LLP, Los Angeles, CA, for Barstow Truck Parts and Equipment Co., Inc.

MEMORANDUM DECISION AND ORDER RE: CROSS MOTIONS FOR SUMMARY JUDGMENT UNDER CERCLA AND RCRA

WANGER, District Judge.

## I. INTRODUCTION

The California Department of Toxic Substances Control ("DTSC") moves for summary judgment against The Estate of William Huffman, to the extent of its insurance, as allowed under California Probate Code § 550. Doc. 947, filed June 21, 2002. Counter–Defendant Great American Insurance Company opposes DTSC's motion. Doc. 979. Intervenor Defendant Ohio Casualty opposes DTSC's motion. Doc. 976. DTSC moves for summary judgment on CERCLA liability against Defendant and Third Party Plaintiff Barstow Truck Parts and Equipment Co., Inc. ("Barstow"). Doc. 951. DTSC moves for summary judgment on Liability under RCRA against Barstow. Doc. 949. Barstow opposes both motions. Docs. 971 and 972. Barstow moves for summary judgment against DTSC on the issue of immunity under the Recycler Exemption, CERCLA's Section 127, Doc. 960. Oral arguments were heard October 18, 2002.

## II. BACKGROUND

On January 13, 1997, DTSC filed this suit for cost recovery and declaratory relief under the Comprehensive Environmental Response, Compensation and Liability Act ("CERCLA"), 42 U.S.C. §§ 9607 and 9613, and under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972, for response, removal, and remediation costs resulting from a release of hazardous substances at or around a Mojave, California, site known as the Mobile Smelting Property (the "Site"). Plaintiff also seeks declaratory relief regarding the defendants' responsibility for future response costs incurred by DTSC and injunctive relief to abate conditions at the Site which pose an imminent and substantial danger to public health and the environment.

From approximately 1963 until 1995, with a short closure forced by the County of Kern between 1983–1986, Mobile Smelting received and burned diverse materials to recover usable metal for its clients, including: aluminum scrap, lead scrap, copper wire and copper parts, batteries, battery parts, rubber insulation, plastic or vinyl insulation, paper insulation, and fiberglass insulation. The site is contaminated with numerous and significant amounts of hazardous elements, including copper, lead and dioxins. Mobile Smelting, and the parties who brought materials to Mobile Smelting, are at the center of two clean-up cost recovery law suits, including *Courtaulds Aerospace, Inc., v. William C. Huffman, et al.*, 826 F.Supp. 345 (E.D.Ca.1993) (nearby site, DTSC suit against Mobile Smelting for clean-up cost reimbursement, for the spread of hazardous waste contamination to the property).

As of March 31, 2001, DTSC incurred costs in responding to the contamination of the Site totaling slightly more than $4 million, not including legal enforcement costs incurred by the Attorney General. *See* Doc. 934, Exh. A at ¶ 4. Forty-seven of the original defendants and third party defendants have settled with DTSC. The only defendants remaining are Barstow

Truck Parts and Equipment Company, Inc., the Estate of Huffman, and one liability insurer for the Estate, Great American Insurance Company.

Congress enacted Section 127, the Superfund Recycling Equity Act, to exempt certain bona fide recycling transactions and recyclers from CERCLA liability. Section 127 was signed into law as a rider to H.R. 3194, on November 29, 1999. On January 28, 2000 DTSC submitted a motion for Summary Judgment, arguing that the Section 127 recycling exemption does not apply to this pending action. Docs. 563 & 564. On May 25, 2000 the amendment was found retrospectively applicable and was to be "applied to all parties and all transactions in this pending action brought by the California DTSC," if provisions of the statute were satisfied. *Department of Toxic Substances Control v. Interstate Non–Ferrous Corporation*, 99 F.Supp.2d 1123, 1154 (E.D.Ca.2000); Doc. 607.

## III. *LEGAL STANDARD*

### A. *Notice of Motion, Procedural Requirements*

Federal Rules of Civil Procedure, Rule 7(b), requires: "an application to the court for an order shall be by motion which, unless made during a hearing or trial, shall be made in writing, shall state with particularity its grounds therefore, and shall set forth the relief or order sought." The requirement is sufficient if it "is stated in a written notice of the hearing of the motion." Fed. R. Civ. Pro. 7(b). "The writing requirement is intended to insure that the adverse parties are informed and have a record of both the motion's pendency and the grounds in which the movant seeks an order." 5 Wright and Miller, FEDERAL PRACTICE AND PROCEDURE, Civil 2nd, § 1191 at 38. "[A] motion for summary judgment is made 'with particularity'

when it stated the theory on which the movant was proceeding, listed pleadings and papers upon which the movant relied and stated the motion was made pursuant to Rule 56 authorizing summary judgment." 5 Wright and Miller, § 1192 at 40 citing *U.S. v. Krasnov*, 143 F.Supp. 184 (D.C.Pa.1956) *affirmed per curiam*, 34, 355 U.S. 5, 78 S.Ct. 34, 2 L.Ed.2d 21 (1957). "When the grounds for [a] motion [are] extensively discussed both in the parties briefs and at oral argument ... the failure to state [a rule] [does] not require an automatic denial." 5 Wright and Miller, § 1192 at 42 citing *Span–Deck, Inc. v. Fabcon, Inc.*, 570 F.Supp. 81 (D.Minn. 1983). "The District Court has inherent power to overlook the absence of a statement of particular grounds if the movant submits affidavits and briefs and his adversary is fully informed of thereby and has not been prejudiced." 5 Wright and Miller, § 1192 at 45.

### B. *Summary Judgment*

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *California v. Campbell*, 138 F.3d 772, 780 (9th Cir.1998). The evidence must be viewed in light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir.2001), *amended by* 268 F.3d 639 (9th Cir.2001).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). If the moving party fails to meet this burden, "the nonmoving party has no obligation to produce anything, even if the nonmoving party would have the ultimate burden of

persuasion at trial." *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.,* 210 F.3d 1099, 1102–03 (9th Cir.2000). However, if the nonmoving party has the burden of proof at trial, the moving party must only show "that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Once the moving party has met its burden of proof, the non-moving party must produce evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995). The nonmoving party cannot simply rest on its allegations without any significant probative evidence tending to support the complaint. *Devereaux,* 263 F.3d at 1076.

[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp.,* 477 U.S. at 322–23, 106 S.Ct. 2548.

### C. Summary Adjudication

The purpose of Rule 56(d) is to salvage some results from the judicial effort involved in evaluating a summary judgment motion and to frame narrow triable issues if the court finds that the order would be helpful with the progress of litigation. *National Union Fire Ins. Co. v. L.E. Myers Co., Inc.,* 937 F.Supp. 276, 285 (S.D.N.Y.1996). An order under Rule 56(d) narrows the issues and enables the parties to recognize more fully their rights, yet it permits the court to retain full power to completely adjudicate all aspects of the case when the proper time arrives. *See* 10A Charles A. Wright, Arthur R. Miller and Mary Kay Kane, Federal Practice And Procedure, § 2737 at 455–56 (2d ed.1983).

The procedure under Rule 56(d) is designed to be ancillary to a summary judgment motion. Unlike Rule 56(c), which allows for interlocutory judgment on a question of liability, Rule 56(d) does not authorize the entry of a judgment on part of a claim or the granting of partial relief. *Id.,* § 2737, at 457.

The obligation imposed on the court by Rule 56(d) to specify the uncontroverted material facts is technically compulsory. *See Woods v. Mertes,* 9 F.R.D. 318, 320 (D.Del.1949). However, if the court determines that identifying indisputable facts through partial summary judgment would not materially expedite the adjudicative process, it may decline to do so. *See* Wright & Miller, *supra,* § 2737, at 460.

### D. CERCLA Liability § 9607(a)

"Any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for: (A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the na-

tional contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 9604(i) of this title." 42 U.S.C. § 9607.[1]

■ To establish liability under CERCLA, plaintiff must prove: 1) the site is a disposal or treatment "facility;" 2) there has been a release, or a threatened release of hazardous substances from the facility; 3) the plaintiff has incurred costs in response to the release or threatened release; and, 4) the defendant falls within one of the four classes of responsible persons. *United States v. Chapman,* 146 F.3d 1166, 1169 (9th Cir.1998), *3550 Stevens Creek Assoc. v. Barclays Bank of California,* 915 F.2d 1355, 1358 (9th Cir. 1990), *cert. denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

■ Four classes of persons are strictly liable for releases of hazardous substances: (1) current owners and operators of a facility where hazardous substances were disposed; (2) past owners or operators who owned or operated the facility at the time of the disposal; (3) transporters of the hazardous substances, and; (4) persons who arrange for disposal or treatment at any facility containing such substances. *Courtaulds Aerospace, Inc., v. William C. Huffman, et al.,* 826 F.Supp. 345, 349 (E.D.Ca.1993).

■ Section 9607(a)(3) creates strict liability for arrangers: an arranger is "*any person who by contract, agreement, or otherwise arranges for disposal or treatment,* or arranged with a transporter for trans-

1. Title 42 U.S.C. § 9607 provides:

Notwithstanding any other provision or rule of law, and subject only to the defenses set forth in subsection (b) of this section(1) the owner and operator of a vessel or a facility, (2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of, (3) any person who by contract, agreement, or otherwise arranged for disposal or treatment, or arranged with a transporter for transport for disposal or treatment, of hazardous substances owned or possessed by such person, by any other party or entity, at any facility or incineration vessel owned or operated by another party or entity and containing such hazardous substances, and (4) any person who accepts or accepted any hazardous substances for transport to disposal or treatment facilities, incineration vessels or sites selected by such person, from which there is a release, or a threatened release which causes the incurrence of response costs, of a hazardous substance, shall be liable for—(A) all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the national contingency plan; (B) any other necessary costs of response incurred by any other person consistent with the national contingency plan; (C) damages for injury to, destruction of, or loss of natural resources, including the reasonable costs of assessing such injury, destruction, or loss resulting from such a release; and (D) the costs of any health assessment or health effects study carried out under section 104(i) [42 U.S.C. § 9 604(i)]. 42 U.S.C. § 9607.

When remediation of a contaminated site involves multiple parties, claims for contribution may arise. Any person may seek contribution from any other person who is liable or potentially liable under section 107(a) [42 U.S.C. § 9607(a)], during or following any civil action under section 106 [42 U.S.C. § 9606] or under section 107(a). Such claims shall be brought in accordance with this section and the Federal Rules of Civil Procedure, and shall be governed by Federal law. In resolving contribution claims, the court may allocate response costs among liable parties using such equitable factors as the court determines are appropriate. Nothing in this subsection shall diminish the right of any person to bring an action for contribution in the absence of a civil action under section 106 or section 107.

port for disposal or treatment, of *hazardous substances* owned or possessed by such person, by any other party or entity, at any facility owned or operated by another party or entity and containing such hazardous substances ...." CERCLA does not define the term "arranged." *Courtaulds Aerospace, Inc., v. William C. Huffman, et al.*, 826 F.Supp. 345, 349 (E.D.Ca.1993). CERCLA provides that "disposal" shall have the meaning provided in the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 *et seq.* RCRA defines "disposal" as:

> The discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste or hazardous waste into or on any land or water so that such solid waste or hazardous waste or any constituent thereof may enter the environment or be emitted into the air or discharged into any waters, including groundwaters.

*Courtaulds Aerospace*, 826 F.Supp. at 349 citing 42 U.S.C. § 6903(3). The Ninth Circuit has held that "disposal for purposes of section [9607(a)(3)] refer[s] only to the affirmative act of discarding a substance as waste, and not to the productive use of the substance." *Courtaulds Aerospace*, 826 F.Supp. at 349, citing *3550 Stevens Creek Assoc. v. Barclays Bank of California*, 915 F.2d 1355, 1362 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

"The term 'treatment', [sic] when used in connection with hazardous waste, means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume. Such term includes any activity or processing designed to change the physical form or chemical composition of hazardous waste so as to render it nonhazardous." 42 U.S.C. § 6903(34).

■ Section 107(a) creates the right of contribution, the "contours and mechanics" of which are specified in section 113(f). *See The Pinal Creek Group v. Newmont Mining Corp.*, 118 F.3d 1298, 1301–02 (9th Cir.1997) (section 107 creates the claims of contribution, *i.e.*, liability, among PRPs (Potentially Responsible Party) and section 113 qualifies the nature of the claim, *i.e.*, how to apportion liability among PRPs). In *Pinal Creek*, the Ninth Circuit held: "under CERCLA, a PRP does not have a claim for the recovery of the totality of its cleanup costs against other PRPs, and a PRP cannot assert a claim against other PRPs for joint and several liability." *Pinal Creek*, 118 F.3d at 1306. Rather, "a PRP is limited to a contribution claim governed by the joint operation of §§ 107 and 113." *Id.*

### E. CERCLA, Section 127 Exemption

■ On November 29, 1999, Congress amended CERCLA. U.S.C. § 9627 ("Section 127"). Section 127(a)(1) exempts recyclers of "recyclable materials." "Recyclable material" is defined as:

> [S]crap paper, scrap plastic, scrap glass, scrap textiles, scrap rubber (other than whole tires), scrap metal, or spent lead-acid batteries, as well as minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use prior to becoming scrap.

"The burden is on the person who arranged for a transaction, by selling recyclable material or by otherwise arranging for the recycling of recyclable material, to demonstrate by a preponderance of the evidence that the statutory criteria are met." *DTSC v. Interstate Non–Ferrous*

*Corp.,* 99 F.Supp.2d 1123, 1126 (E.D.Ca. 2000) citing § 127(c)-(e). "The effect of Section 127 is to exempt from arranger liability and transporter liability under CERCLA §§ 107(a)(3) and (a)(4), recyclers who arrange for or transport recyclable material." *Interstate Non–Ferrous Corp.,* 99 F.Supp.2d at 1126.

## IV. UNDISPUTED FACTS

A. *Undisputed facts, listed by DTSC and accepted by Ohio Casualty. Great American Insurance Company "neither admits nor den[ies]" any of the facts at issue*

The following facts are adjudicated as not in material dispute:

1. The Mobile Smelting Site ("Site") is located at Reed Road and United Street in Mojave, California.

2. The site was owned by William Huffman from about 1963 until Mr. Huffman's death.

3. Mr. Huffman died in 1995.

4. Huffman started burning airplane parts on the site in 1964.

5. Huffman burned aircraft aluminum for Barstow Truck Products and Equipment Company.

6. Huffman burned a variety of different kinds of materials, including the following: lead cable with insulation; telephone wires and communications wires that were lead-covered and had vinyl or plastic over them; copper from electric motors, covered with lacquer; No. 2 insulated copper wire; drilling collars with rubber rings; transformer coils that had lacquer coating rather than insulation and therefore did not have to burn long and did not produce much ash; copper with lead coating over a vinyl or plastic coating; jumpers from transformers that had braided and rubberized insulation; aluminum with rubber insulation that was burned in the copper furnace; ballast transformers that were small pieces of copper connectors; Reda cable that was 90% copper and that had some special type of insulation, possibly fiberglass, possibly rubber; thin communications wire with about 30% insulation by weight; House wire with different insulation: rubber, woven insulation, plastic, fiber; Edison No. 1 wire that was about 90% copper and 10% insulation; co-ax cable with fiber insulation on outside and rubber on inside; paper wrapped wire that is insulated with cardboard or paper.

7. Copper, lead, and dioxins are hazardous substances under CERCLA.

8. The Department of Toxic Substances Control is currently in the process of undertaking additional sampling to determine the extent of contamination.

9. Starting in the late 1960s until approximately 1983, Barstow brought scrap materials to the Mobile Smelting Site to have the materials processed on the site either by incineration or by smelting to remove the insulation and to recover the metal for Barstow.

10. Services provided by Mobile Smelting to Barstow included smelting or incinerating/burning various scrap metals that contained metals in order to remove the insulation and reclaim the metal for Barstow.

11. Barstow brought insulated copper wire scrap to the Mobile Smelting Site.

12. The insulated wire that Barstow brought to the Mobile Smelting Site contained copper and/or copper compounds.

13. Lead was present, in some cases, as an insulation or shield around the copper wire.

14. Some of the insulated copper wire that Barstow brought to the site was insulated with paper insulation.

15. Some of the insulated copper wire that Barstow brought to the site was insulated with fabric insulation.

16. Some of the insulated copper wire that Barstow brought to the site was insulated with rubber insulation.

17. Some of the insulated copper wire that Barstow brought to the site had polyvinyl chloride (PVC) insulation.

18. Invoice numbers 6666 and 7554 are true and correct copies of the invoices copied from the Mobile Smelting files.

19. Barstow brought at least two shipments of dross to the Mobile Smelting Site, one of which was identified as Solder Dross.

20. Dross and solder dross contain lead either as an intended ingredient or a contaminant.

21. The burning of the insulated copper wire and other insulated materials produced ash.

22. When the scrap materials were incinerated at the Mobile Smelting Site, some ash from the incineration was collected in the baghouse of the incinerator.

23. Baghouse Ash remains on the Mobile Smelting Site and contains copper, lead, and dioxin in levels as high as the following: lead 64,000 parts per million ("ppm"); copper 170,000 ppm; dioxin 323,000 parts per billion.

24. Barstow never removed the Baghouse Ash from the Site.

25. When insulated copper wire was burned at the Mobile Smelting Site, it produced ash that dropped to the bottom of the cart on which the wire was burned. (Bottom Ash). The Bottom Ash is about 95% coarse, gray, ash with small bits and pieces of metal in it.

26. The Bottom Ash contained copper and/or copper compounds.

27. The Bottom Ash contained lead and/or lead compounds.

28. Bottom Ash remains on the Mobile Smelting Site and contains copper, lead and dioxin in levels as high as the following: lead 18,300 ppm; copper 313,000 ppm; dioxin 2.9 ppb.

29. Barstow did not remove the Bottom Ash that remained from the burning of insulated copper wire brought to the Site by Barstow. Barstow left the Bottom Ash on the Site.

30. Mobile Smelting stored the Bottom Ash in one or more piles on the ground of the Site.

31. On October 31st, 1990, the department issued an Imminent and/or Substantial Endangerment Determination regarding the Mobile Smelting Site.

32. The soil and ash piles on site are covered with polymer coating that is 1/4 to 1/2 inches thick. The polymer coating is only a temporary cap that will last about two years and must be renewed. If it is not renewed, it will break down and the contaminated sod and ash on the site will be exposed to wind and rain, and the contamination can be spread.

33. If the contamination is not remediated, persons who come onto the Mobile Smelting Site, persons who are on neighboring properties, and persons in the vicinity of the Mobile Smelting Site may be exposed to the hazardous substances from the site.

34. On occasion, people have attempted to break into the Seatrain container. If someone ever broke through the lock and ripped open one of the bags, he or she would be exposed to extremely hazardous levels of dioxins. The Baghouse Ash and dioxins would be further exposed to the elements and spread through the environment.

35. There are approximately 100 residential structures within a two-mile radius of the Site, some of which are a mile downwind from the Site. People living in these areas are potentially exposed to dioxin, lead, and copper from the contaminated soil off-Site and from the on-Site soil and ash piles when the polymer coating is breached.

36. Animals off-Site are exposed to dioxin, lead, copper, and zinc from the contaminated soil off-Site and from the on-Site soil when the polymer coating is breached.

37. If the Site is not permanently remediated, there is substantial danger that people and animals will be exposed to hazardous levels of dioxins, lead, and copper, and that the contamination will be further spread through the environment, increasing the area of contamination.

38. The unburned insulation on the insulated copper wire that Barstow brought to the Mobile Smelting Site had no value to Barstow.

39. Mobile Smelting's burning of the insulated copper wire that Barstow brought to the Mobile Smelting Site removed the insulation from the metal portion of the insulated copper wire.

40. Barstow brought the wire to the Site to have the wire incinerated in order to remove the insulation from the wire and to take back the copper after the insulation had been burned off. Rajacich Depo.1993, pp. 25–26, 28, 46, 50; RTA 9.

41. At all times Barstow always retained ownership of the wire brought to the Site, including during the time that the wire was being burned on the Site. RTA 19; Huffman Depo. Vol. 2, pp. 399–400.

42. Mobile Smelting "got rid of" the insulation and received payment from Barstow for recovering the copper.

43. After breaking the batteries, Barstow took the terminal posts or tops and brought them to Mobile Smelting. May Depo, pp. 8, 15; Rajacich Depo.2001, pp. 21–23, 25, 48.

44. At the Mobile Smelting facility, the battery posts or tops from Barstow were melted to recover the lead in ingots. After the melting, Mobile Smelting returned the lead ingots to Barstow. Rajacich Depo. 2001 at pp. 28–29.

45. Invoices were created by Huffman in the normal course of his business at or near the time of the activity, and were given to the drivers when they came to pick up the materials. Payment by the scrap dealers was based on the invoices. Huffman Depo. Vol. 1, pp. 295–96, 305–06, 320–21, 405–06, 412, 678, 680–81, 689–90, 692, 694–96, 698–700, 703–706, 708, 720–721, 725, 727–728, 986, 1405–1407, 1437–1349.

46. The Department had its contractor make copies of the invoices that were obtained from Mobile Smelting. The originals were returned to Mr. Huffman, and the copies were placed in the Department files in Sacramento. Wallberg Decl.; Declaration of Barry Padilla ("Padilla Decl."); Huffman Depo. Vol. 3, pp. 468–69.

47. In metallurgy, the term "dross" refers to the skimmings that are removed from the surface of a molten metal bath. Drosses are comprised, principally, of metal oxides and they vary in metal content according to the composition of the bath from which they are drawn. Dross is generally very friable and will crumble and break apart easily into small particles. The term "solder dross" is dross resulting from soldering operations. Solder dross must be melted in order to recover the solder. Declaration of Norman Riley (hereinafter "Riley Decl.") at ¶ 14.

48. Dross and solder dross contain lead either as an intended ingredient or a contaminant. Riley Decl. at ¶ 18.

49. Barstow paid Mobile Smelting to recover solder from the solder dross. Invoices 6666 and 7554 attached as Exh. A to Wallberg Decl.

50. The amount of ash generated and released from a particular burn and the amount of copper, lead, and dioxins in the ash will depend on the type and quantity of material being burned; the type and quantity of insulation on the material; and the operating conditions of the incineration system and air pollution control system on the particular day (including the temperature of the furnace, the operation of the baghouse, how much filter cake was in the baghouse, etc.) Hart Decl. at ¶¶ 6–10; Rsp. To Second Int. (Request No. 21).

51. At all times, Mobile Smelting permitted the scrap dealers, including Barstow, to remove the Bottom Ash generated from the incineration of insulated wire. RTA 25, Huffman Depo. Vol. 3, pp. 424–25; Vol. 4, pp. 672–73, 681–82, 736–37, 751–52, 762, 794, 795, 796–97; Vol. 5, pp. 977, 978, 987, 988–90; Vol. 7, pp. 1237, 1239; Vol. 8, pp. 1487–88.

52. Mr. Rajacich has no personal knowledge of any agreement that Barstow had with Mobile Smelting concerning the Bottom Ash. Rajacich Depo.2002, pp. 104–05, 110–11.

53. People have on several occasions broken through the fence and entered the Site. Kovac Decl. at ¶ 22.

B. *Undisputed facts, listed by Barstow and accepted by DTSC*

1. Barstow was a family-run business that regularly bought and sold scrap metal.

2. Barstow bought and sold processable and reusable scrap metal parts and pieces such as: ... (b) scrap aluminum from items such as battery boxes and aircraft parts; (c) miscellaneous irony scrap and gear cases; and (d) insulated copper wire and steel-wrapped wire/cable. "Irony scrap" refers to non-ferrous metal that contains ferrous scrap, or iron that makes it unclean or unpure. Metallic airplane parts and metallic household parts also fall under this category.

3. Barstow did not send any whole batteries to the Mobile Smelting Site; only the batteries' metal connector parts that had a market value were sent.

4. Barstow's recyclable material, brought to the Mobile Smelting site for processing, met a commercial specification grade pursuant to relevant industry standards, with the EXCEPTION of: dross, Bottom Ash, and battery parts (which DTSC claims is irrelevant).

5. The commonly accepted industry specifications, set forth by organizations such as the Institute of Scrap Recycling Industries, Inc. ("ISRI") as to Barstow's recyclable material, are: "Druid" for insulated copper wire scrap, "Berry" and "Birch" for Nos. 1 and 2 copper wire, "Racks" for secondary soft lead, "Radio" for secondary hard lead, "Throb" for sweated aluminum, "Taint Tabor" for scrap aluminum, "Tense" for miscellaneous iron scrap and gear cases, "Redda" for wire and cable, as well as dross specifications, which are based on the predominant metal. Insulated wire and cable is a universally accepted commercially viable recyclable material in the scrap metal trade, with the EXCEPTION of: dross, Bottom Ash, and battery parts (which DTSC claims is irrelevant).

6. The metal trade has been in existence for thousands of years and continues to the present day. A history of trade in scrap metal has been memorialized in the

Wall Street Journal, the American Metal Market (AMM), *Scrap* magazine and other industry publications, including ISRI that have tracked the price of scrap for decades. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts.

7. Various source materials concerning the metals market such as the American Metal Market's Guide to Metal Trading are available to the public. Metal prices are also established by the London Metal Exchange Ltd. ("LME"), the New York and Chicago commodities exchanges and various other exchanges around the world. In addition, there are various secondary industry publications that provide information on material uses, and how the material competes with virgin materials such as metal as feedstock. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts.

8. Markets existed for all the recyclable materials handled by Barstow and sent to the Mobile Smelting Site, including processed and unprocessed scrap material such as battery terminal tops, posts, and ends, scrap aluminum, irony scrap and gear cases and insulated copper wire and steel wire. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts. DTSC also disputes recycling claims "to the extent that it assumes that all materials brought to Mobile Smelting by Barstow were recyclable materials as defined by Section 127."

9. Barstow regularly sold the recyclable material to purchasers that either further processed the material or incorporated it into their own production processes. It was Barstow's common practice for the handled recyclable materials to be made available for appropriate reuse in order to add value to the scrap metal so that it could be sold on the metal market and reused. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts. DTSC also disputes the claim "to the extent that it assumes that all materials brought to Mobile Smelting by Barstow were recyclable materials as defined by Section 127."

10. Battery parts were processed into ingots and then sold. Scrap aluminum was processed into large ingots and sold as feedstock. Iron was sent to foundries and melted in its use as feedstock. However, DTSC disputes any insulated copper was used as feedstock, as "the insulation had to be removed before the copper could be used as a feedstock." DTSC contend the statement is irrelevant as to dross, Bottom Ash and battery parts.

11. Barstow's [reclaimed] materials were ultimately purchased by entities such as refineries, smelters, ingot makers, brass and wire rod mills, and foundries that used a substantial portion of the recovered metal as a feedstock for the manufacturer of a new saleable product, except as to Barstow's Bottom Ash. For example, Barstow, after processing materials at the Mobile smelting site, sold aluminum ingot to Monarch Aluminum; processed lead went to Western Lead; lead secondary ingot went to Morris P. Kirk and Ethel Corporation; No. 1 copper wire went to Phelps Dodge; and No. 2 copper wire to various refineries. DTSC contends the statement is irrelevant as to dross and battery parts.

12. It is commonly known in the industry that recycled scrap, copper and lead replace virgin ore. There are various industry publications that provide information on material uses, and how the material competes with virgin materials. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts. DTSC also disputes the claims "to the extent that it assumes that all materials brought to Mobile Smelting by Bar-

stow were recyclable materials as defined by Section 127."

13. ISRI estimates that the percentage of United States' raw material needs supplied by recycled non-ferrous metals are 43% copper, 32% aluminum and 55% lead. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts.

14. Barstow did not melt the scrap metal prior to bringing it to the Mobile smelting site or anytime thereafter. However, DTSC contends this is irrelevant as to dross, Bottom Ash and battery parts.

15. Barstow intended that the material taken to the Mobile Smelting site be recycled; EXCEPT as to the Bottom Ash and the insulation which DTSC claims Barstow left or intended to leave at the Mobile Smelting Site.

16. Barstow was in a position to reasonably believe Mobile Smelting was in compliance with relevant statutes, regulations and/or orders at all relevant times given the governmental oversight of the site and the fact that it remained open until 1983.

C. *Undisputed facts, listed by DTSC and accepted by Barstow*

1. The Mobile Smelting Site ("Site") is located at Reed Road and United Street in Mojave, California.

2. The Site was owned by William Huffman from about 1963 until Mr. Huffman's death.

3. Mr. Huffman died in 1995.

4. Huffman started burning airplane parts on the Site in 1964.

5. Huffman burned aircraft aluminum for Barstow Truck Products and Equipment Company.

6. Copper, lead, and dioxins are hazardous substances under CERCLA.

7. The insulated wire that Barstow brought to the Mobile Smelting Site contained copper and/or copper compounds.

8. Barstow took terminal posts or tops from batteries and brought them to Mobile Smelting.

9. The terminal tops or posts [of scrap batteries] had copper and lead in them.

10. At the Mobile Smelting Facility, the battery posts or tops from Barstow were melted to recover the lead in ingots. After the melting, Mobile Smelting returned the lead ingots to Barstow.

11. Barstow did not send the lead plates to Mobile Smelting. The lead plates went to a lead smelter.

12. In metallurgy, the term "dross" refers to the skimmings that are removed from the surface of a molten metal bath. Drosses are comprised, principally, of metal oxides and they vary in metal content according to the composition of the bath from which they are drawn.

13. Dross and solder dross contain lead either as an intended ingredient or a contaminant.

14. The burning of the insulated copper wire and other insulated materials produced ash.

15. Barstow did not remove all of its Baghouse Ash from the Mobile Smelting Site.

16. The Bottom Ash contained copper and/or copper compounds.

17. The Bottom Ash contained lead and/or lead compounds.

18. The amount of ash generated and released from a particular burn and the amount of copper, lead, and dioxins in the ash will depend on the type and quantity of material being burned; the type and quantity of insulation on the material; and the operating conditions of the incineration system and air pollution control system on

the day (including the temperature of the furnace, the operation of the baghouse, how much filter cake was in the baghouse, etc.).

19. At all times, Mobile Smelting permitted the scrap dealers, including Barstow, to remove the Bottom Ash generated from the incineration of insulated wire.

20. Mr. Rajacich has no personal knowledge of any agreement that Barstow had with Mobile Smelting concerning the Bottom Ash.

21. On October 31st, 1990, the department issued an Imminent and/or Substantial Endangerment Determination regarding the Mobile Smelting Site.

22. The soil and ash piles on site are covered with polymer coating that is 1/4 to 1/2 inches thick. The polymer coating is only a temporary cap that will last about two years and must be renewed. If it is not renewed, it will break down and the contaminated sod and ash on the site will be exposed to wind and rain, and the contamination can be spread.

## V. DISCUSSION

### A. Summary Judgment Motion Against Estate of Huffman

Plaintiff California Department of Toxic Substances Control (DTSC) requests summary judgment against the Estate of William Huffman regarding the issue of liability, to the extent of applicable insurance coverage. Plaintiff specifically requests summary adjudication on whether:

1)(a) Huffman owned and operated the Mobile Smelting Site located at Reed Road and United Street in Mojave, California at the time that hazardous substances were disposed at the Site;

1)(b) the Estate is the current owner of the Mobile Smelting Site;

2) there has been a release and/or threatened release of the hazardous substances at the Site;

3) the Department has incurred costs in responding to the release or threatened release of hazardous substances at the Site;

4) the Estate is jointly and severally liable under CERCLA, 42 U.S.C. sections 9601 et seq., to the extent of any insurance coverage, for the costs incurred by the department in responding to the release or threatened release of hazardous substances at the Site;

5) the Estate is jointly and severally liable, to the extent of any insurance coverage, for all future costs incurred by the Department in responding to the release or threatened release of hazardous substances at the Site.

Plaintiff DTSC notes that it is not addressing the liability of insurers for the estate or the duty of insurers to indemnify the estate, both of which will be addressed in a later motion. Doc. 947 at 2–3.

### 1) Process sufficiency, California Probate Code

■ Plaintiff brought suit against the Estate, to the extent of applicable insurance coverage, by serving decedent's insurers pursuant to California Probate Code § 550. California Probate Code § 550 allows a party to bring an action to establish decedent's liability, "for which the decedent was protected by insurance against decedent's estate" without having to join decedent's "personal representative or successor in interest." Cal. Prob.Code § 550 (West 1991). "If a plaintiff seeks damages in excess of the insurance policy limits, the plaintiff must file a claim and establish the liability other than under this chapter." Cal. Prob.Code § 550. Under section 552, the estate of decedent is

named as defendant, however, only the insurer is served notice of the proceedings.

The suit technically proceeds against the estate to determine liability, but any such liability is imposed only upon the insurance companies and only up to the amount of any applicable insurance. The proceedings shall be in the name of the estate, "but otherwise shall be conducted in the same manner as if the action was against the personal representative." Cal. Prob. Code § 552. Unless the lawsuit joins the estate's personal representative, "a judgment in the action under this chapter ... does not adjudicate rights by or against the estate," Cal. Prob.Code § 553, *i.e.* the estate will not be liable for damages unless the personal representative is joined and served. The insurer may "deny or otherwise contest its liability in an action under this chapter or by an independent action." Cal. Prob.Code § 553. "A judgment in favor of the plaintiff in the action is enforceable only from the insurance coverage and not against property in the estate." Cal. Prob.Code § 554. Damages sought under this chapter must be within the limits and coverage of the insurance. Rights to any excess damages shall be waived, unless the personal representative of the estate is joined as directed under § 554(b)(1)-(2). Cal. Prob.Code § 554. "Court approval is not required before the plaintiff may commence an action against the estate for the insured amount." 12 Witkin § 592, citing Law Revision Commission Comment to Probate Code 9390.

Section 550–555 applies "in any case where there is a claim for damages for which the decedent was insured." Law Revision Commission Comment, 1990 Enactment, West's Annotated California Codes Part 13, Chapter 1 at 293. The sections apply "uniformly to actions pending at the death of the decedent and actions commenced after the decedent's death." *Id.*

Great American Insurance Company (Great American) opposes DTSC's motion. Great American contends: DTSC's actions are improper; the Estate has never appeared in this action, and; no personal representative has been asked to defend the Estate's interest in any way. Great American interprets §§ 553–554 to mean: "if the estate's interests are at stake, a personal representative must be joined." Because DTSC "asks the court to enter judgment against the estate," Great American argues a personal representative should have been joined. Doc. 979 at 4. Great American also argues DTSC's motion is faulty because it "goes beyond the parameters of the Probate Code and requests that this court order judgment against the estate." Doc. 979 at 4. Great American does not address the merits of the summary judgment motion.

Section 553, which states that "judgment in the action ... does not adjudicate rights by or against the estate," refers to the fact that any judgment against "the estate" under § 550 is enforceable only from insurance coverage and not against property of the Estate, as required under § 554. Great American misunderstands the purpose and effect of California Probate Code § 550–555. This section of the Code permits a plaintiff to seek recovery from an estate's insurance companies without having to sue the personal representative directly. DTSC complied with the Probate Code's requirements. DTSC named the Estate, served the insurance companies, and proceeded against the Estate in name only. "Further proceedings shall be in the name of the estate, but otherwise shall be conducted in the same manner as if the action were against the personal representative." Probate Code § 552. While Great American may challenge its liability

as an insurer, under section 553 or in an independent action, its objection to this motion based on the lack of service upon a personal representative for Huffman's estate is misplaced as provided by Cal. Prob. C. § 552.

Great American filed no other opposition to the summary judgment motion against estate of Huffman.

### 2) *Notice Sufficiency, Federal Rules of Civil Procedure*

■ Ohio Casualty urges this court to strike DTSC's Motion for Summary Judgment in its entirety, for vagueness. Ohio Casualty contends the notice is "simply too vague to adequately apprise either defendant Huffman, his insurers, or the court of what relief DTSC seeks." Doc. 976 at 3. The notice states DTSC will "move the Court to grant partial summary judgment under [CERCLA] against defendant the Estate of William Huffman to the extent of its insurance coverage." Doc. 946 at 1–2.

"The writing requirement [of FRCP Rule 7] is intended to insure that the adverse parties are informed and have a record of both the motion's pendency and the grounds in which the movant seeks an order." 5 Wright and Miller, *Federal Practice and Procedure*, Civil 2nd, § 1191 at 38. "The District Court has inherent power to overlook the absence of a statement of particular grounds if the movant submits affidavits and briefs and his adversary is fully informed of thereby and has not been prejudiced." 5 Wright and Miller, § 1192 at 45.

DTSC's notice of motion was filed and served on the same day as its Memorandum of Points and Authorities and its accompanying Declarations and Exhibits supporting the Motion. The Motion, taken with the supporting briefs and affidavits filed at the same time, fully inform the insurance companies regarding the motion's specific issues and arguments involved. DTSC seeks a determination of CERCLA liability against the Estate of Huffman and a money judgment against Ohio Casualty to the full extent of the limits of any applicable insurance coverage that Huffman had in place.

Ohio Casualty's argument is viewed as a Motion to Strike, or for More Definite Statement for lack of specificity and is DENIED.[2]

### 3) *DTSC's Motions For Summary Adjudication Issues 1–5*

*1(a). Huffman owned and operated the Mobile Smelting Site located at Reed Road and United Street in Mojave, California at the time that hazardous substances were disposed at the Site*

It is undisputed that Mr. Huffman owned and operated the Mobile Smelting Site located at Reed Road and United Street in Mojave, California, for 33 years between 1962 and 1995. *See* Doc. 957, Declaration of Thomas W. Kovac, Exh. B, Grant Deed; Ohio Casualty's Response to Statement of Undisputed Facts, Doc. 977 at 1; Doc. 958, Declaration of Susan Fiering, Exh. A, Death Certificate. Great American Insurance Company provides no evidence to contest this fact: "Great American Insurance Company will neither admit nor deny this fact." Great American Insurance Company Reply to DTSC's Statement of Undisputed Facts, Doc. 980 at 2.

---

**2.** Between the time this motion was heard and this opinion issued, Ohio Casualty settled with DTSC. Because a tentative oral decision was announced from the bench, in October, 2002, the analysis and decision as related to Ohio Casualty's motion remains in this opinion despite the settlement.

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). "If on motion under [Rule 56] judgment is not rendered upon the whole case ... and a trial is necessary, the court ... shall if practicable ascertain what material facts exist without controversy and what material facts are actually and in good faith controverted. It shall thereupon make an order specifying the facts that appear without substantial controversy ... Upon the trial of the action the facts so specified shall be deemed established." Fed. R.Civ.P. 56(d).

Deposition testimony has established that William Huffman was the sole proprietor who owned and operated Mobile Smelting at the Site. The death certificate, Exhibit A, establishes that he died in 1995. The motion for summary adjudication that Mr. Huffman owned and operated the Mobile Smelting Site between 1963 and 1995 is GRANTED.

### 1(b). The Estate is the current owner of the Mobile Smelting Site

DTSCA claims the Estate of William Huffman owns the Site: "Huffman's Estate has not been probated and no administrator has been appointed. The Estate is therefore the current owner of the property from which there has been a release of hazardous substances, and is liable under CERCLA section 107(a)(1)." Doc. 947. No evidence has been submitted by DTSCA to prove who currently owns the property. At the October 18, 2002 hearing Ohio Insurance Company, Great American Insurance Company, Barstow, and DTSC stipulated that the Estate of William Huffman continues to own the Mobile Smelting Site.

Based on the stipulation of these parties, the Motion for Summary Adjudication that the Huffman Estate currently owns the Mobile Smelting Site is GRANTED.

### 2) There has been a release and/or threatened release of the hazardous substances at the Site

DTSC contends the Mobile Smelting Site is contaminated with high levels of copper, lead, and dioxins and the contamination has migrated beyond the property boundaries and contaminated neighboring properties. The contamination is significantly above allowable levels permitted by the state or federal government for residential or industrial properties. Doc. 947 at 6. The Mobile Smelting Site contains piles of Bottom Ash and containers of Baghouse Ash, "both of which contain hazardous levels of copper, lead, and dioxins." *Id.* These contaminates are hazardous substances under CERCLA.[3]

---

**3.** The term "hazardous substance" means (A) any substance designated pursuant to section 1321(b)(2)(A) of Title 33, (B) any element, compound, mixture, solution, or substance designated pursuant to section 9602 of this title, (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 U.S.C.A. § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 U.S.C.A. § 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 1317(a) of Title 33, (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 U.S.C.A. § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 2606 of Title 15. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term

A release under CERCLA is: "any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping or disposing [of hazardous substances] into the environment." 42 U.S.C. § 9601(22); *U.S. v. Chapman*, 146 F.3d 1166, 1169 (9th Cir.1998). DTSC notes that "environment" is broadly defined under CERCLA to include "surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air." 42 U.S.C. § 9601(8). Citing the Remedial Investigation Summary Report of November 1st 2001 prepared by Cheney, Walton and McCall by Thomas Kovac's expert declaration, DTSC argues it is undisputed hazardous substances have been released at the Mobile Smelting Site. Doc. 947 at 10; Doc. 957; Doc. 989, Exh. A, Remedial Investigation Summary Report.

Ohio Casualty contends DTSC has failed to establish the existence of contamination by any competent evidence. Ohio Casualty complains that because DTSC is taking additional samples, the site is not adequately characterized at the present time. Ohio Casualty complains that the Remedial Investigation Summary Report was not included with Mr. Kovac's declaration.[4] Ohio Casualty contends Mr. Kovac based his opinion on "unspecified" analytical results taken by Tetra Tech, Metcalf & Eddy, and others, but does not identify or attach that data to his declaration. Ohio Casualty argues Mr. Kovac presents the data as his own and does not testify that he himself conducted the relevant studies, therefore "[Mr.] Kovac's testimony presenting other persons' data is simply hearsay and is inadmissible," and DTSC has not proved the existence of contamination.

Ohio Casualty offers no proof of its own disputing the Site's contamination level or that calls into question that the Site is in fact contaminated. Ohio Casualty's focus on the supposed deficiencies in Mr. Kovac's testimony is misdirected. Federal Rule of Evidence 702 states that a qualified expert may testify, offering opinion or otherwise, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Federal Rule of Evidence 703 states that an expert may reply upon facts or data perceived or known to the expert, at or before the hearing, (including hearsay) if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." "The facts need not be admissible in evidence in order for the opinion or inference to be admitted." F.R.E. 703.

Mr. Kovac relies upon studies performed by qualified environmental consulting firms as well as the State of California. As a Hazardous Substances Engineer in charge of the Site project since 1995, Mr. Kovac is qualified to interpret the scientific data presented to him, as data "relied upon by experts in the field," and form an admissible opinion based upon that data. The fact that DTSC and environmental consulting firms are taking additional laboratory samples, as is their duty under law, in no way diminishes the fact that the Site was subjected to an Imminent and Substantial Danger designation in 1990 by the California Health and Welfare Agency's Department of Health Services Toxic Sub-

does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

A list of hazardous substances is at 40 C.F.R. Sect. 302.4, Table 302.4.

4. DTSC included the report with Mr. Kovac's supplemental declaration, as Exhibit A.

stances Control Program:[5] "there is an imminent and substantial endangerment to the public health and welfare and the environment, *because of a release or threatened release of hazardous substances from the site.*" Doc. 957, Exhibit C at 5, Imminent and Substantial Endangerment Determination, Docket No. ISE90/91–002 (emphasis added).

Ohio Casualty's argument that DTSC has not proved a release occurred at the Site is contradicted by its own admissions to undisputed facts listed by DTSC (*i.e.* "Baghouse Ash remains on the Mobile Smelting Site and contains copper, lead, and dioxin in levels as high as the following: lead 64,000 parts per million ('ppm'); copper 170,000 ppm; dioxin 323,000 parts per billion; Bottom Ash remains on the Mobile Smelting Site and contains copper, lead and dioxin in levels as high as the following: lead 18,300 ppm; copper 313,-000 ppm; dioxin 2.9 ppb; Mobile Smelting stored the Bottom Ash in one or more piles on the ground of the Site").

Great American Insurance Company's brief does not address the release issue, nor does Barstow's brief. There can be no dispute, based upon the available evidence in multiple scientific reports as well as expert testimony, Ohio's admissions and Great American Insurance Company and Barstow's lack of response, that hazardous materials have been released at the Site.

Summary Adjudication as to whether there has been a release of hazardous substances at the Site, as defined by CERCLA, is GRANTED.

3) *The Department has incurred costs in response to the release or threatened release of hazardous substances at the Site*

DTSC contends it has outstanding response costs of "slightly more than $4 million through March 21, 2001" attributable to containment of the Site, not including legal enforcement. Doc. 955, ¶ 4 at 2, Declaration of Eric Wallberg. Mr. Wallberg is the case manager for the Expedited Remedial Action Program Unit, Site Mitigation Program, DTSC, for the Mobile Smelting Site. As case manager, Mr. Wallberg coordinates, manages and oversees "activities related to the recovery of response costs incurred by the Department in addressing hazardous substance contamination sites." *Id.* at ¶ 2–3 at 2.

Great American Insurance Company does not refute DTSC's cost argument. Ohio Casualty contends: DTSC asks for a blank check, DTSC has not proved the amount of costs it has incurred; DTSC has not provided sufficient evidence that incurred costs have not already been [compensated] by earlier settlements; the request for judgment of liability against the estate, "to the extent of insurance coverage," overreaches the liability phase of this litigation, and; no future costs have been proved. Ohio Casualty further argues DTSC's "faulty remediation" has "contributed to the spread of contamination," which makes DTSC a "transporter and responsible party." If a transporter or responsible party, DTSC should be "limited to contribution ... and not cost recovery." Doc. 976 at 1.

a. *Overreaching Argument*

Ohio Casualty contends the scheduling conference orders establish a liability phase and a separate cost recovery phase and DTSC's request regarding the Huffman Estate's liability is inappropriate. DTSC asks that a determination be made regarding whether or not it has incurred costs, as part of the CERCLA liability

**5.** Now called the Department of Toxic Substances Control.

determination. Ohio Casualty contends "DTSC has effectively incorporated the cost or damages phase into the liability phase and seeks to go home with an order from the court that DTSC gets every last dollar of coverage, regardless of how much DTSC has actually spent on response costs." Doc. 976 at 5. DTSC responds it is only seeking a determination regarding liability. Recoverable costs will be determined in a later phase of the litigation or in a separate action. At that time Ohio Casualty will have a full and fair opportunity to contest the amount of the Department's costs.

Ohio Casualty misinterprets DTSC's motion. DTSC is not asking for a blank check, nor is it requesting a quantified cost determination. One of the four elements which must be proved to determine CERCLA liability is whether or not the plaintiff has incurred response costs. Without such a determination, CERCLA liability cannot be addressed. DTSC intentionally left out specific cost factors and proof, which it notes will be addressed at the cost phase of this litigation.

### b. Cost Evidence

■ Ohio Casualty contends DTSC has not sufficiently shown it incurred costs in response to clean up at the Site. Doc. 976 at 5. Ohio Casualty argues Mr. Wallberg's declaration is insufficient because the following is not included: a resume; a breakdown of costs; a verification that costs were reasonable and necessary; a verification that costs were incurred in connection with the site at issue and not one of the adjacent sites; a projection of future costs. Ohio Casualty takes issue with Mr. Wallberg's qualifications to testify to the cost issue: "Mr. Wallberg's declaration identifies him as a Hazardous Substances Scientist, whatever that is ... Apparently, Mr. Wallberg is not an environmental engi-

neer, which is usually the professional qualification for certifying that response costs are reasonable and necessary." Doc. 976 at 6. Also at issue is the lack of evidence as to what documents Mr. Wallberg consulted to form his opinion and what type of costs he discusses: "has he *read* [the files], analyzed them, and summarized them himself? ... are 'outstanding' costs paid costs, incurred-but-not-paid costs, costs not already defrayed by settlements with other responsible parties, or something else?" *Id.*

Ohio Casualty's concern regarding what "outstanding" means has merit. DTSC has recovered more than $7 million in settlements from other defendants who have been dismissed. When the cost phase of this litigation ensues, DTSC must account for what costs remain uncompensated after the settlement funds have been credited. At the October 18, 2002 hearing DTSC stated that it was now only seeking a declaratory judgment for future cost liability as past cost reimbursement had been accomplished through previous settlements with former third-party defendants.

Ohio Casualty's other arguments lack merit. DTSC provided a declaration from Mr. Wallberg, which states the department had incurred some costs (*i.e.* at least $4 million). In response to Ohio Casualty's complaints, DTSC's reply brief includes a declaration by Ms. Calloway, Senior Accounting Officer assigned to the Cost Recovery Unit of DTSC. Doc. 988. Ms. Calloway's declaration includes a summary of costs and copies of invoices and bills from 1989 through March 2001 and sufficiently proves that the Department has incurred response costs related to the Mobile Smelting Site. Ohio Casualty objected at the October 18th hearing to DTSC's reply submission of Ms. Calloway's declaration. Ohio Casualty contends the reply brief submission deprived them of the opportunity to respond.

Ohio Casualty's technical objection was overruled; it is indisputable that DTSC incurred response costs at the Site. Judicial Notice is taken of this fact, based upon the history of the case, findings of fact in related cases such as *Courtaulds,* and DTSC's submissions. DTSC is not required at this point to prove the costs were reasonable and related to the site cleanup. Nor is it required to prove the exact amount of past costs or a projection of future costs to determine liability under CERCLA. These issues will be addressed in the litigation's Cost phase.

### c. Future Costs Unproven

Ohio Casualty repeats its "blank check" analogy and argues that DTSC must provide evidence of expected future costs. CERCLA provides for a declaratory judgment on future cost liability, "the Court shall enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages." 42 U.S.C. § 9613(g)(2). An order declaring responsible parties liable for future costs is appropriate, although the amount will remain undetermined until proof of the amount of actual costs recoverable under CERCLA is provided by DTSC.

### d. Transporter and Responsible Party Issue

Ohio Casualty argues that because third parties have broken into the site and damaged some of the containment covers, DTSC "is not containing the contamination and may be contributing to the spread of contamination." Ohio Casualty contends: DTSC has "admitted that its faulty remediation has contributed to the spread of contamination;" DTSC is a responsible party; and, DTSC can only seek contribution, not cost recovery. DTSC refutes Ohio Casualty's argument: "if third parties have interfered with the department's measures taken to contain the release of hazardous substances, it is the third parties who are the potentially responsible parties, not the department." Doc. 991.

 Governmental regulatory action taken to clean up a contaminated site does not subject the government to liability under CERCLA:

"[n]o State or local government shall be liable under this subchapter for costs or damages as a result of actions taken in response to an emergency created by the release or threatened release of a hazardous substance generated by or from a facility owned by another person. This paragraph shall not preclude liability for costs or damages as a result of gross negligence or intentional misconduct by the State or local government. For the purpose of the preceding sentence, reckless, willful, or wanton misconduct shall constitute gross negligence."

42 U.S.C. § 9607(d)(2). If Ohio Casualty believes DTSC's actions have been grossly negligent, reckless, willful or wanton, it should have provided evidence that could have offset the costs incurred. The absence of admissible evidence belies the claim of fault by DTSC.

Summary Adjudication that DTSC has incurred costs in response to the release or threatened release of hazardous substances at the Site is GRANTED. This does not determine the amount or recoverability of such response costs.

4) *The Estate is jointly and severally liable under CERCLA, 42 U.S.C. sections 9601 et seq., to the extent of its insurance coverage, for the costs incurred by the department in its response to the release or threatened release of hazardous substances at the Site*

To establish liability under CERCLA, plaintiff must prove: 1) the site is a dis-

posal or treatment "facility;" 2) there has been a release, or a threatened release of hazardous substances from the facility; 3) the plaintiff has incurred costs in response to the release or threatened release; and, 4) the defendant falls within one of the four classes of responsible persons. *United ed States v. Chapman*, 146 F.3d 1166, 1169 (9th Cir.1998), *3550 Stevens Creek Assoc. v. Barclays Bank of California*, 915 F.2d 1355, 1358 (9th Cir.1990), *cert. denied*, 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991). DTSC has established prongs No. 2 and 3 (release and incurrence of costs).

### a. Disposal or Treatment Facility

DTSC contends the site is a facility because, "leaded, copper, and dioxins were detected in the soil, in the Bottom Ash, and in the Baghouse Ash, at the Mobile Smelting Site and have migrated offsite onto neighboring properties." Doc. 947. A Site is a disposal or treatment facility if, "a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located." 42 U.S.C. § 9601(9). It is undisputed that hazardous materials have been deposited and stored at the Mobile Smelting Site. Neither Great American Insurance Company or Ohio Casualty disputes DTSC's contention. In view of the finding of releases, the fact that the Mobile Smelting Site is a "Facility" within the definition of CERCLA is established.

### b. Defendant Falls within One of the Four Classes of Responsible Persons

Four classes of persons are strictly liable for releases of hazardous substances: (1) current owners and operators of a facility where hazardous substances were dis-

posed; (2) past owners or operators who owned or operated the facility at the time of the disposal; (3) transporters of the hazardous substances, and; (4) persons who arranged for disposal or treatment at any facility containing such substances. *Courtaulds Aerospace, Inc., v. William C. Huffman, et al.,* 826 F.Supp. 345, 349 (1993). It is undisputed that William Huffman was the owner and operator of the site and strictly liable under CERCLA. He owned and operated Mobile Smelting during the time that Baghouse Ash and Bottom Ash containing copper, lead, and dioxins were generated and released at the Site. *See supra,* undisputed facts at 11–15.

### C. Strict Liability Requirement Met

An entity is strictly liable under CERCLA for contaminating the environment if it meets the four requirements. A party is jointly and severally liable if the harm to the environment is indivisible. "Where two or more persons acting independently caused a distinct or single harm for which there is a reasonable basis for division according to the contribution of each, each is subject to liability only for the portion of the total harm that he has himself caused." *U.S. v. Chem–Dyne Corp.,* 572 F.Supp. 802, 809 (S.D.Ohio 1983) citing RESTATEMENT 2ND TORTS § 433 A, 881 (1976); Prosser, LAW OF TORTS (4th ed.1971), pp. 313—314. "But where two or more persons cause a single and indivisible harm, each is subject to liability for the entire harm." 572 F.Supp. at 809 citing RESTATEMENT 2ND TORTS § 875 (1976); Prosser, LAW OF TORTS (4th ed.1971), pp. 315—316.[6]

"Under § 9607(a)(4), any owner, operator or other responsible party is strictly liable for all costs of removal or remedial

---

**6.** DTSC notes that Congress, in passing the SARA amendments to CERCLA, "recognized and endorsed the prevailing 'uniform federal rule of joint and several liability,' " specifical- ly adopting the holding in *Chem–Dyne. See* Doc. 947, fn. 7 at 13 citing H.R.Rep. No. 99– 253(1), 99th Cong., 1st Sess. 74, *reprinted in* 1986 U.S.C.C.A.N. 2835, 2856.

action, any other necessary response costs, damages for injury to natural resources and the costs of any health assessments." 42 U.S.C. § 9607(a)(4) (1995). This liability is joint and several, subject to the defenses set forth in § 9607(b). *See, e.g., United States v. Carolina Transformer Co.,* 978 F.2d 832, 836 (4th Cir.1992); *International Fabricare Institute v. U.S. E.P.A.,* 972 F.2d 384, 390 (D.C.Cir.1992). "It is § 9607(a) that establishes the liability of each owner or operator, § 9607(b) that sets forth the defenses and § 9607(c) that limits that liability to the specified amount." *State of Cal. v. Montrose Chemical Corp. of California,* 104 F.3d 1507, 1518 (9th Cir.1997). "Once liability is established, the defendant may avoid joint and several liability by establishing that it caused only a divisible portion of the harm—for example, it contributed only a specific part of the hazardous substances that spilled. Even if a defendant cannot do so, it may seek contribution from other PRPs under 42 U.S.C. § 9613(f)(1)." *Carson Harbor Village, Ltd. v. Unocal Corp.,* 270 F.3d 863, 871 (9th Cir.2001) citing *Pinal Creek Group,* 118 F.3d at 1300 (noting that Congress's amendment of CERCLA to include § 9613(f)(1) "clarif[ies] and confirm[s]" that contribution is available to PRPs).

Summary judgment is warranted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." Fed.R.Civ.P. 56(c); *California v. Campbell,* 138 F.3d 772, 780 (9th Cir.1998). There is no genuine issue as to any material fact. William Huffman's Estate is strictly liable as an owner and operator under CERCLA, up to the maximum amount of its applicable insurance coverage, as provided under California Probate Code 550–555. William Huffman's Estate is jointly and severally liable, as provided

in 9607(a): "(2) any person who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of … shall be liable for— all costs of removal or remedial action incurred by the United States Government or a State or an Indian tribe not inconsistent with the National Contingency Plan."

Summary Judgment that the Estate of Huffman is jointly and severally liable, such judgment to be paid from and not to exceed its applicable insurance coverage, as provided under Probate Code 550–555 and CERCLA is GRANTED. The actual amount of liability must be determined at the cost phase and is subject to permitted affirmative defenses under CERCLA as well as any insurance liability defenses. At the October 18th hearing, DTSC conceded it is now only seeking a declaratory judgment regarding liability for future costs.

5) *The Estate is jointly and severally liable, to the extent of its applicable insurance coverage, for all future costs incurred by the Department in its response to the release or threatened release of hazardous substances at the Site*

"Declaratory relief allocating future costs is [ ] consistent with the broader purposes of CERCLA." *Boeing Co. v. Cascade Corp.,* 207 F.3d 1177, 1191 (9th Cir.2000). The Ninth Circuit observes:

CERCLA expressly provides for declaratory actions for determining liability as to future response costs. Section 9613(g)(2) provides that in actions under § 9607, 'the court shall enter a declaratory judgment on liability for response costs … that will be binding on any subsequent action or actions to recover further response costs ….' These sections envision that, before suing, CERC-

LA plaintiffs will spend some money responding to an environmental hazard. They can then go to court and obtain reimbursement for their initial outlays, as well as a declaration that the responsible party will have continuing liability for the cost of finishing the job. This system strikes a balance between a number of considerations. By requiring a plaintiff to take some positive action before coming to court, CERCLA ensures that the dispute will be ripe for judicial review. [citations omitted]. On the other hand, by not requiring plaintiffs to perform full cleanup before coming to court, and by expressly providing for declaratory judgments, CERCLA substantially reduces the risk involved in performing the cleanup. This encourages private response. [citation omitted].

*In re Dant & Russell, Inc.*, 951 F.2d 246, 249 (9th Cir.1991).

Ohio Casualty contends a ruling on future cost liability is a "blank check" unsupported by any evidence regarding future costs. Doc. 976 at 10. Ohio Casualty argues: DTSC has confused the order of proceedings; DTSC has to prove its costs before it can obtain a judgment that a given party is liable for some amount of them, and; "the amount of the check must be determined before the Court can sign it and Huffman's insurers be required to pay for it." *Id.* Ohio Casualty is confused. DTSC is not required to now provide any proof of the nature or amount of future costs. Ohio Casualty cites no case law nor any section of CERCLA which requires such proof. CERCLA states:

In any such action described in this subsection, the court *shall* enter a declaratory judgment on liability for response costs or damages that will be binding on any subsequent action or actions to recover further response costs or damages. A subsequent action or

actions under section 9607 of this title for further response costs at the vessel or facility may be maintained at any time during the response action, but must be commenced no later than 3 years after the date of completion of all response action. Except as otherwise provided in this paragraph, an action may be commenced under section 9607 of this title for recovery of costs at any time after such costs have been incurred.

42 U.S.C. § 9613(g)(2) (emphasis added). DTSC is entitled to a declaratory judgment that Huffman's Estate is jointly and severally liable, to be paid by Huffman's applicable insurance policies, for which there is coverage up to a maximum of no more than the policy limits, for DTSC's future response site costs. Summary Judgment as to liability of the Estate of Huffman is GRANTED as to future response costs according to proof.

B) *Barstow Trucking Motion for Summary Judgment Against Plaintiffs*

Barstow requests Summary Judgment, arguing its actions in connection with the Mobile Smelting Site are exempt from CERCLA, under the Section 127 recycling exemption. DTSC opposes this motion and argues that Barstow's actions do not meet § 127 exemption requirements.

1. *Section 127 Applicability*

Barstow argues that all of the "scrap" materials it brought to the Mobile Smelting Site qualify for the § 127 recycling exception to CERCLA liability. "Recyclable material" is defined under § 127 as:

scrap paper, scrap plastic, scrap glass, scrap textiles, scrap rubber (other than whole tires), scrap metal, or spent lead-acid batteries, as well as minor amounts of material incident to or adhering to the scrap material as a result of its normal

and customary use prior to becoming scrap.

"The burden is on the person who arranged for a transaction ... to demonstrate by a preponderance of the evidence that the statutory criteria are met." *DTSC v. Interstate Non–Ferrous Corp.*, 99 F.Supp.2d 1123, 1126 (E.D.Ca.2000) citing § 127(c)-(e).

DTSC concedes Barstow's transactions "involving insulated copper wire and scrap aluminum" are exempt under § 127. Barstow's insulated copper wire and scrap aluminum transactions under § 127 are exempt. Summary adjudication is GRANTED as to copper wire and scrap aluminum.

DTSC argues Barstow's transactions involving Bottom Ash, dross, and battery parts do not meet the threshold requirements of § 127 exemption.

### a. Bottom Ash

■ Barstow argues that the hazardous Bottom Ash produced as a result of legitimately recycling scrap metal, such as copper wire with insulation, does not affect Barstow's status as a bona fide recycler as to those materials. Barstow notes that § 127 specifically encompasses "minor amounts of material incident to or adhering to the scrap material as a result of its normal and customary use prior to becoming scrap." Because § 127 encompasses such material adhering to the scrap metal, it must also encompass the Ash created by burning off such material adhering to the scrap metal. Doc. 994. Barstow argues that the § 127 exemption was created by Congress to protect bona fide recycling transactions from CERCLA liability and that all of Barstow's transactions qualify for § 127 exemption. Doc. 961 at 1.

DTSC argues that Bottom Ash is not a recyclable material, Barstow cannot prove that Bottom Ash is a recyclable material,

and Barstow cannot claim exemption under § 127 for treatment or disposal of the Bottom Ash produced and left at Mobile Smelting as a by-product of Barstow's arrangement with Mobile Smelting. DTSC contends that disposal by incineration of the Bottom Ash is a separate transaction that creates liability under CERCLA.

No Ninth Circuit case law deals specifically with Bottom Ash produced as a result of recycling § 127 recyclable materials. An earlier opinion in a related case recognized defendants (including Barstow) arranged for the disposal of the hazardous Bottom Ash, a waste, by leaving it with Mobile Smelting Site: "[b]y leaving the ash with Huffman, Moving Defendants rid themselves of the ash." *Courtaulds Aerospace, Inc. v. William C. Huffman, et. al.*, 826 F.Supp. 345, 353 (E.D.Ca.1993). Defendants' argument in *Courtaulds*, that they did not own and made no arrangement for the disposal of the hazardous Bottom Ash by product of their having scrap metal incinerated at Mobile Smelting, was rejected; Summary Judgment on the issue was denied.

The dispute as presented by these parties is: whether hazardous Bottom Ash, a waste byproduct that results from a legitimate and exempted recycling process, is covered by the § 127 recycling exemption, or is itself a separate waste disposal, arranged for by defendants, which creates separate CERCLA liability. This dispute is not argued or addressed in the *Courtaulds* decision.

Barstow contends that its actions are similar to the battery recycler whose unrecyclable material remnants do not affect the recycler's exempt status under § 127. Barstow cites *Gould Inc. v. A & M. Battery & Tire Serv.*, 232 F.3d 162 (3rd Cir. 2000) for the proposition that § 127 encompasses a broad definition of recyclable

materials. In *Gould* the court found that a battery recycler who sold whole batteries to a recycling facility was exempt under § 127 despite the contamination that occurred when the recycling facility later illegally disposed of contaminated battery casings. The plaintiff in *Gould* stipulated that the defendant met the § 127 recycling requirements, *i.e.:* (1) the recyclable material met a commercial specification grade; (2) a market existed for the recyclable material; (3) a substantial portion of the recyclable material was made available for use as feedstock for the manufacture of a new saleable product; (4) the recyclable material could have been a replacement or substitute for a virgin raw material; (5) the person arranging for the recycling "did not recover the valuable components of such batteries;" (6) the person was in compliance with applicable federal environmental regulations regarding the storage, transport, management, or other activities associated with the recycling of spent lead-acid batteries. Once the *Gould* defendants proved they met the bona fide recycling criteria (stipulated by plaintiffs), the plaintiffs had the burden to prove defendants were excluded from § 127 coverage based on one of the five exemptions in § 127(f)(1).[7] The *Gould* plaintiffs were unable to meet this burden. Summary Judgment was entered for defendants, exempting them from CERCLA liability under § 127.

DTSC contends the Bottom Ash, as an expected by-product of incineration with no value to Barstow, is a waste product under CERCLA and leaving it at the Site amounts to a separate arrangement for disposal transaction. DTSC cites *ASARCO*, which holds that slag is "a by-product of smelting with a nominal commercial value" and is a waste under CERLCA. Doc. 951 at 15 citing *Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565, 1575 (9th Cir.1994). Asarco's principal business was smelting copper; slag was a byproduct of the smelting process. Asarco dumped the slag in a nearby Bay for many years and later sold it to logging companies. Though slag was a "product" under the State of Washington Products Liability Act, the Ninth Circuit affirmed the district court's finding that slag was also a "waste" under CERCLA.

Neither *Gould* nor *ASARCO* are directly on point. In *Gould* the defendants sold whole batteries to a battery recycling plant which later contaminated the environment by illegally dumping the left-over battery casings. In contrast, Barstow brought insulated copper wire to Mobile Smelting and paid to have the copper extracted and returned to Barstow; the process of burning off the insulation created the contaminated Bottom Ash by-product. The *Gould* defendants fit squarely within § 127, while Barstow does not so easily fit. In *ASARCO* the defendant dumped, and later sold,

---

**7.** The five exclusions in CERCLA § 127(f)(1) are:

(1) the recycling defendant had an objectively reasonable basis to believe that the batteries would not be recycled;

(2) the recycling defendant had an objectively reasonable basis to believe that the recycled material would be burned as fuel or for energy recovery or incineration;

(3) the recycling defendant had a reason to believe that hazardous substances had been added to the recyclable material for purposes other than processing for recycling;

(4) the recycling defendant failed to exercise reasonable care with respect to the management and handling of the recyclable material;

(5) the recycling defendant had an objectively reasonable basis to believe at the time of the recycling transaction that the consuming facility was not in compliance with substantive (not procedural or administrative) provisions of the environmental laws.

the slag byproduct of its copper smelting plant. Barstow may have "arranged for dumping" the Bottom Ash byproduct at the Site, but Barstow did not sell it to Huffman. Whether or not Barstow "dumped" or "arranged for disposal" of the Ash under CERCLA remains a fact issue to be resolved by the totality of the dealings between Barstow and Mr. Huffman and Barstow's knowledge and intent as to the wastes that would be generated by the recycling of insulated wire. A trial is required to determine whether or not the Ash by-product, generated by Barstow's legitimate and exempted recycling transactions, should be treated as a discrete disposal transaction.

### b. Dross

 Barstow contends the dross it took to Mobile Smelting is "irony scrap," or scrap metal, covered under § 127. Barstow argues that as it understands the various definitions of dross, the dross Barstow sent to Mobile Smelting has the same physical characteristics as scrap metal that is in a solid and amorphous agglomerated state and that does not allow it to be easily crushed, split or crumbled and must be further processed. Doc. 961 at 7. Barstow contends DTSC can produce no evidence that the dross referenced on two invoices at issue is the "powdery, flaky substance that may, according to possible regulations, be a 'waste' product and not within section 127's definition of 'scrap metal.'"

DTSC argues that Barstow brought solder dross to Mobile Smelting to recover the metal. Because "dross and solder dross frequently contain large amounts of lead as an unintended ingredient," both metals contain lead as a contaminant and are hazardous substances under CERCLA. Doc. 951 at 16–17. According to DTSC, neither dross nor solder dross meet the definition of scrap metal. *Id.* at 17.

DTSC claims that dross is considered the "skimmings that are removed from the surface of a molten metal solder bath," comprised principally of metal oxides. *Id.* Dross varies in metal content, "according to the composition of the bath from which it is drawn." *Id.* Dross is generally, "very friable and will crumble and break apart easily into small particles or powder." *Id.* Because the dross Barstow brought to Mobile Smelting is allegedly not "scrap metal," according to DTSC, Barstow's arrangement for treatment of the dross (*i.e.* smelting to make it amenable for recovery) subjects Barstow to CERCLA liability under 107(a)(3) as a party who arranged for treatment or disposal of a hazardous substance. *Id.* at 17–18.

In reply, Barstow vigorously contests DTSC's categorization and definition of the dross at issue and claims: 1) DTSC cannot prove Barstow arranged for "disposal" or "treatment" of a hazardous waste; and, 2) the type of metal dross Barstow took to Mobile Smelting for processing was a useful product. Barstow argues DTSC cannot meet its threshold burden to prove Barstow liable under CERCLA for the dross at issue. Barstow cites to the fact that only two invoices have been produced with the word "dross" on them. Barstow notes there is no Federal or State regulatory definition for dross or solder dross. Barstow points to DTSC's expert witness, Mr. Riley, who admits that even today there is confusion among members of the regulatory community as to the classification and status of dross. Doc. 994 at 5 *citing* deposition of N. Riley, attached at paragraph 3 to declaration of Ross H. Hirsch at 12:15–18.

Barstow further contends that what one regulator believes is the 2002 interpretation of "dross" is irrelevant to prove the type of material transactions between Mobile Smelting and Barstow in the 1970's.

Doc. 994 at 5 fn. 4. Barstow asserts DTSC's expert, Mr. Riley, admits he had no personal knowledge of the type of dross Barstow processed at Mobile Smelting other than his review of the two invoices that mention "dross." Barstow challenges the credibility of DTSC's witnesses and discounts DTSC's interpretation of Barstow President Rajacich's deposition and competency on the dross issue.

In its own Motion for Partial Summary Judgment, DTSC argues that the dross referenced on invoices 6666 and 7554 was not agglomerated dross, *i.e.* not solid chunks of metal, and therefore does not meet the definition of scrap metal and recyclable material. Doc. 967 at 3–4. DTSC discounts Barstow President Rajacich's competency to testify as to what type of dross was brought to Mobile Smelting: "Mr. Rajacich further admitted that he has no idea whether Barstow ever obtained any dross and sent it to Mobile Smelting, because it was something his father would have handled since his father handled the scrap end of the business." *Id.* at 5. DTSC further notes that, "despite Mr. Rajacich's speculation that invoice 7554 refer [SIC] to 'Railroad journal dross' he admitted that he never heard of the term 'dross' used in connection with Railroad journals, and in fact, does not have an understanding of what the word 'dross' is." *Id.* at 5–6. Witness credibility cannot be determined on a motion for summary judgment.

DTSC contends Barstow cannot prove the dross was a scrap metal and recyclable material and therefore cannot claim the protection of the § 127 recycling exemption for its dross transactions. Barstow contends it does not have to prove the dross was a scrap metal until DTSC proves that the dross was a hazardous material and subjects Barstow to CERCLA liability. Barstow is correct, DTSC has the burden to prove Barstow was an arranger for treatment or disposal of hazardous material to be liable under CERCLA for the transaction at issue, before Barstow has to prove that it qualifies for a § 127 exemption. *See U.S. v. Chapman,* 146 F.3d 1166, 1169 (9th Cir.1998).

Barstow moved for summary judgment, all inferences are drawn in favor of the nonmoving party, DTSC. While DTSC's evidence is weak, it creates a triable issue of material fact regarding the nature and qualities of the dross delivered to the Site, as hazardous material, or recyclable material, and what the parties' intent and course of dealings were, before Barstow is subject to CERCLA liability and if dross qualifies for a § 127 exemption.

Summary Judgment as to Barstow's liability involving the dross transactions with Mobile Smelting is DENIED.

### c. Battery Parts

Barstow sent metal battery components, such as battery terminals (tops, ends, and posts), to Mobile Smelting for "recovery and processing." Doc. 961 at 5. Barstow admits it did not send whole batteries to Mobile Smelting. Barstow claims it dealt with submarine battery parts and forklift battery parts but denies it sent automobile battery parts. Barstow contends the battery parts are not subject to CERCLA liability because they are "useful products." *Id.* at 6. Barstow cites *United States v. Mountain Metal Company,* 137 F.Supp.2d 1267 (N.D.Ala.2001) for the proposition that "battery parts, once removed from the battery proper, were afforded the useful product defense and not subjected to arranger liability under CERCLA." Doc. 961 at 6. At the October 18th hearing, Barstow argued that the battery parts constituted scrap metal covered under § 127(c), not battery recycling under § 127(e).

DTSC rejoins that the cases Barstow relies upon address the removal and sale of battery lead plates to a smelter for use as raw material or feedstock, and are inapplicable to Barstow's transactions. As Barstow brought battery tops, ends, and posts for treatment and retained ownership of these parts during the entire processing, they were not usable in their existing form and had to be smelted before being sold to third parties. Doc. 967 at 9. DTSC contends that, rather than involving the sale of a useful product, Barstow's transactions involve an arrangement for treatment of a waste product that was not useful in its existing form.

 The test for the "useful product" defense is whether the commodity being sold will continue to be used for its originally intended purpose. *Gould Inc. v. A & M Battery & Tire Service*, 933 F.Supp. 431, 436 (M.D.Pa.1996) *citing Catellus Dev. Corp. v. United States*, 34 F.3d 748 (9th Cir.1994). "The distinction between the sale of a useful product and the sale of scrap batteries for purposes of CERCLA liability was explained in *Chatham Steel Corp. v. C. Brown*, 858 F.Supp. 1130 (N.D.Fla.1994)" as follows:

> When a party sells a product incidentally containing a hazardous substance but having value as being useful, for the purpose for which it was manufactured, then the transaction is less likely to be an "arrangement" to dispose of a hazardous substance ... In these cases, the party receiving the product will use the product in the manner for which it was manufactured ... On the other hand, if a product has no value for the purpose for which it was manufactured and it contains a hazardous substance, then it is more likely the sale is an "arrangement" to dispose of the substance.
>
> ... the products at issue [in *Chatham Steel*] were spent lead acid batter-

ies.... the record does not indicate the batteries ...... were capable of being used as batteries—i.e., they could supply electric current. Rather, the batteries only had value because of the lead they contained. Instead of dealing in a "useful" product, Defendants essentially trafficked in a hazardous substance. This is precisely the type of transaction CERCLA covers.

DTSC correctly asserts *Catellus Development Corp. v. United States*, 34 F.3d 748, 749, 752–53 (9th Cir.1994) and *Cadillac Fairview v. United States*, 41 F.3d 562, 564, 566 (9th Cir.1994) control. In *Catellus* the defendant argued that spent battery parts were not waste because they were being recycled and the lead extracted from them would be put to further productive use. *Catellus*, 34 F.3d at 751. The Ninth Circuit referred to current SWDA regulations to construe § 107(a)(3) and determined that lead reclaimed from spent batteries was waste (not recyclable material subject to § 107's exemption): "a material is 'reclaimed' if it is processed to recover a useful product, or if it is regenerated. Examples are recovery of lead values from spent batteries and regeneration of spent solvents." *Id.* at 750 citing 40 CFR § 261.1(c)(4)(1993). The court recognized that when the batteries were sent to the battery breaking plant, "an arrangement for treatment" was created. *Id.* at 753. Continuous ownership or control of the hazardous substance was not required: "it is sufficient that the substance had the characteristic of waste ... at the point at which it was delivered to another party." *Id.* Under *Catellus*, lead from spent batteries is considered waste; when lead from spent batteries is arranged to be processed, it falls under CERCLA's definition of treatment, which includes rendering waste "amenable for recovery."

Under *Cadillac,* the Ninth Circuit held liability under section 107(a)(3) was "not limited to those who own the hazardous substances, who actually dispose of or treat such substances, or who control disposal or treatment process." *Cadillac,* 41 F.3d at 565. The language of 107(a)(3) "extends liability to persons 'otherwise arranging' for disposal or treatment of hazardous substances whether owned by the arranger or by any other party or entity." *Id.* at 566. The defendants in *Cadillac* attempted to avoid arranger liability under cases which hold the sale of a hazardous substance, in the form of a useful product, were not an arrangement for disposal or treatment within the meeting of CERCLA. In *Cadillac,* Dow Chemical sold styrene to tire companies for rubber manufacture. When the styrene became too contaminated it was returned to Dow for decontamination and sold back to the tire companies in clean form. This process was repeated until the styrene became too contaminated to process. Dow then buried it on the site. The tire companies argued they simply bought new styrene and sold used styrene (a useful product) to Dow Chemical to process and create clean, usable styrene. The court rejected this argument and stated the trier of fact "could readily conclude on the facts ... that the transfer of contaminated styrene to Dow by the rubber companies was not a sale of a useful product but an arrangement for treatment of a hazardous waste." *Id.*

It is undisputed that Barstow took spent battery parts (though not lead plates) to Mobile Smelting and received in return lead ingots produced by smelting the parts. *Supra* at II. Undisputed Facts: "8. Barstow took terminal posts or tops from batteries and brought them to Mobile Smelting. 9. The terminal tops or posts [of scrap batteries] had copper and lead in them." It is undisputed Barstow had the lead battery parts smelted or incinerated. Undisputed Facts, *supra,* at 14, ¶ 10:

10. Services provided by Mobile Smelting to Barstow included smelting or incinerating/burning various scrap metals that contained metals in order to remove the insulation and reclaim the metal for Barstow;

Undisputed Facts, *supra,* at 17, ¶ 44:

44. At the Mobile Smelting Facility, the battery posts or tops from Barstow were melted to recover the lead in ingots. After the melting, Mobile Smelting returned the lead ingots to Barstow. Rajacich Depo.2001 at pp. 28–29;

Undisputed Facts, *supra,* at 24, ¶ 10:

10. At the Mobile Smelting Facility, the battery posts or tops from Barstow were melted to recover the lead in ingots. After the melting, Mobile Smelting returned the lead ingots to Barstow.

The word "treatment," when used in connection with hazardous waste, means "any method, technique, or process, including neutralization, *designed to change the physical, chemical, or biological character* or composition of any hazardous waste *so as to* neutralize such waste or so as to *render such waste* nonhazardous, safer for transport, *amenable for recovery,* amenable for storage, or reduced in volume..." 42 U.S.C. § 6903(34) (emphasis added). Like the defendant in Catellus, Barstow took the spent battery parts to Mobile Smelting to have the parts "treated" and render the lead in the parts "amenable for recovery." The parts themselves were not "useful products." This meets the definition of "an arranger" under CERCLA: "persons who arrange for disposal or treatment at any facility containing such substances." *Courtaulds Aerospace, Inc., v. William C. Huffman, et al.,* 826 F.Supp. 345, 349 (E.D.Ca.1993).

Barstow argues in the alternative that taking battery parts to be smelted is a

recycling action exempted under § 127. At the October 18th hearing, Barstow asserted battery parts were "scrap metal" and exempted under § 127(c), rather than falling under the battery recycling exemption § 127(e). DTSC contends that because Barstow broke the batteries and reclaimed valuable components from the batteries after taking battery parts to Mobile Smelting, Barstow does not qualify for § 127 exemption. DTSC further argues that Barstow has failed to show it complied with environmental requirements regarding battery recycling at the time of the transaction.

Barstow's oral argument that the battery parts were "scrap metal" conflicts with the actual wording of § 127. Section 127 separates battery recycling and imposes separate eligibility requirements. If the legislature intended battery parts to be treated the same as "scrap metal," the battery recycling exemption under 127(e) would be superfluous. "It is 'a cardinal principle of statutory construction' that 'a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant.'" *TRW Inc. v. Andrews,* 534 U.S. 19, 122 S.Ct. 441, 151 L.Ed.2d 339 (2001) *quoting Duncan v. Walker,* 533 U.S. 167, 174, 121 S.Ct. 2120, 150 L.Ed.2d 251 (2001); *see United States v. Menasche,* 348 U.S. 528, 538–539, 75 S.Ct. 513, 99 L.Ed. 615 (1955) ("It is our duty 'to give effect, if possible, to every clause and word of a statute,'") (quoting *Inhabitants of Montclair v. Ramsdell,* 107 U.S. 147, 152, 2 S.Ct. 391, 27 L.Ed. 431 (1883)). Barstow's interpretation would read the battery recycling clause out of Section 127. Barstow cited no case law at oral argument to support its proposition. Battery Parts are subject to the section 127(e) recycling exemption, not the 127(c) "scrap metal" exemption.

Assuming, *arguendo,* that Barstow could meet the threshold requirements of a recycler regarding the battery parts under 127(e), DTSC has proved that § 127 does not cover Barstow. Section 127(e)(2) governs whether battery related transactions qualify for the recycling exemption:

> [t]ransactions involving spent lead-acid batteries, spent nickel-cadmium batteries, or other spent batteries shall be deemed to be arranging for recycling if the person who arranged for the transaction (by selling recyclable material or otherwise arranging for the recycling of recyclable material) can demonstrate by a preponderance of the evidence that at the time of the transaction—(1) the person met the criteria set forth in subsection (c) with respect to the spent lead-acid batteries, spent nickel-cadmium batteries, or other spent batteries, but *the person did not recover the valuable components of such batteries ....*

It is undisputed that Barstow recovered the battery's valuable components by taking posts, terminals, and cables to Mobile for smelting, retaining ownership of those components, and acquiring the valuable lead from those components once smelted. The only reason Barstow sent the parts to Mobile Smelting was to complete its recovery by treatment of the "valuable components." Barstow's battery related transactions do not qualify for § 127 exemption.

Barstow's battery related transactions with Mobile Smelting qualify Barstow as an "arranger" and do not fall under the § 127 recycling exemption. Barstow's request for Summary Judgment as to battery parts is DENIED.

### C) *DTSC Motion for Summary Judgment under CERCLA*

Plaintiff DTSC makes the following specific requests for Summary Adjudication and Summary Judgment against Barstow:

(1) Barstow is a party that arranged for treatment or disposal of hazardous substances at the Mobile Smelting Site;

(2) there has been a release and/or threatened release of hazardous substances from the Site;

(3) DTSC has incurred costs in response to the release or threatened release of hazardous substances from the Site;

(4) Barstow is jointly and severally liable for the past costs incurred by the Department in responding to the release or threatened release of hazardous substances from the Site; and,

(5) Barstow is jointly and severally liable for all future costs incurred by the Department in responding to the release or threatened release of hazardous substances from the Site.

DTSC admits Barstow is not liable under CERCLA for transactions with Mobile Smelting which involve insulated copper wire and scrap aluminum, which satisfy CERCLA's § 127 recycling exemption. Summary Judgment as to Barstow's non-liability regarding those transactions has been GRANTED. DTSC's motions for summary judgment apply only to Barstow's transactions which allegedly involve Bottom Ash, dross, and battery parts. At the October 18th hearing, DTSC conceded it now only seeks a declaratory judgment for liability as to future costs, since past cost reimbursement had been satisfied by various settlement agreements with former third-party defendants. A current (past) liability analysis must be done, however, in order to determine the applicability of future liability.

(1) *Barstow is a party who arranged for treatment or disposal of hazardous substances at the Mobile Smelting Site;*

This issue is analyzed under Barstow's Motion for Summary Judgment, *supra,* at 45–59.

### a. *Bottom Ash*

A genuine issue of material fact exists regarding whether or not Bottom Ash, as a byproduct of legitimate recycling exempted § 127 recycling transactions, benefits from § 127 exemption, or is a separate hazardous waste transaction for which Barstow may be liable as an "arranger" for its disposal. The 127(f)(1) exclusion for burning for incineration appears to apply. Summary Adjudication is DENIED.

### b. *Dross*

A genuine issue of material fact exists regarding whether or not Barstow brought any hazardous dross to Mobile Smelting not covered under the § 127 recycling exemption. *See supra.* Summary Adjudication as to Barstow's status as an arranger under CERCLA, with respect to Barstow's dross related transactions, is DENIED.

### c. *Battery Parts*

Barstow is an arranger with respect to its battery part transactions with Mobile Smelting. *See supra,* 56–63. Summary Adjudication as to Barstow's status as an arranger under CERCLA, with respect to Barstow's battery part related transactions with Mobile Smelting, is GRANTED. The extent and effect of battery parts releases of hazardous substances cannot be determined on this record.

(2) *There has been a release and/or threatened release of hazardous substances from the Site*

This issue is analyzed under DTSC's motion for Summary Judgment against the Huffman Estate, *supra,* at 30–34. Summary Adjudication as to whether there has been a release of hazardous substances at

the Site, as defined by CERCLA, is GRANTED.

(3) *DTSC has incurred costs in responding to the release or threatened release of hazardous substances from the Site*

This issue is analyzed under DTSC's motion for Summary Judgment against the Huffman Estate, *supra,* 34–39. Summary adjudication as to whether DTSC incurred costs in response to the release or threatened release of hazardous substances at the Site is GRANTED.

(4) *Barstow is jointly and severally liable for the past costs incurred by the Department in response to the release or threatened release of hazardous substances from the Site*

*a. Bottom Ash*

Liability may not be determined without trial to resolve the genuine issues of material facts related to whether or not Bottom Ash is a byproduct of legitimate exempted § 127 recycling transactions and benefits from § 127 exemption, or is a separate disposal of hazardous waste. Summary Judgment as to Barstow's liability with respect to the Bottom Ash is DENIED.

*b. Dross*

Liability may not be determined without trial to resolve the genuine issues of material facts related to whether or not Barstow brought to Mobile Smelting any hazardous dross not covered under the § 127 recycling exemption. Summary Judgment as to Barstow's liability with respect dross related transactions is DENIED.

*c. Battery Parts*

To establish liability under CERCLA, plaintiff must prove: 1) the site is a disposal or treatment "facility;" 2) there has been a release, or a threatened release, of hazardous substances from the facility; 3) the plaintiff has incurred costs in response to the release or threatened release; 4) the defendant falls within one of the four classes of responsible persons. *United States v. Chapman,* 146 F.3d 1166, 1169 (9th Cir.1998), *3550 Stevens Creek Assoc. v. Barclays Bank of California,* 915 F.2d 1355, 1358 (9th Cir.1990), *cert. Denied,* 500 U.S. 917, 111 S.Ct. 2014, 114 L.Ed.2d 101 (1991).

The first three requirements are met as discussed above. The fourth requirement has also been decided, Barstow is an "arranger," one of the four classes of responsible parties, with respect to its battery parts transactions with Mobile Smelting. *See supra,* at 56–63. Barstow is not a recycler with respect to its battery parts transactions. *See supra,* 56–63.

A *prima facia* case for strict liability is met under CERCLA; DTSC has established the four requirements previously discussed. *U.S. v. Chapman,* 146 F.3d 1166, 1169 (9th Cir.1998); *Ascon Properties, Inc. v. Mobil Oil Co.,* 866 F.2d 1149, 1152–53 (9th Cir.1989). Once a *prima facia* case for response costs is established, the burden shifts to the defendant to prove the government's response action was inconsistent with the National Contingency Plan, *Chapman,* 146 F.3d at 1169, or the party meets the recycling exemption contained in section 127. 42 U.S.C. § 9627. If a party is able to prove a recycling exemption, the burden shifts back to the government to prove one of section 127's exceptions to the exemption. 42 U.S.C. § 9627(f).

Summary Judgment as to Barstow's liability, with respect to its battery part transactions is conditionally GRANTED. Barstow is strictly liable for response costs at Mobile Smelting unless it can prove, during the cost phase of this litigation, that

DTSC's response costs were not consistent with the National Contingency Plan.

### d) *Joint and several liability*

▮ "Most district courts that have faced the issue have interpreted section 107 of CERCLA to impose, as a matter of federal law, joint and several liability for indivisible injuries with a correlative right of contribution. *See, e.g., Colorado v. AS-ARCO, Inc.,* 608 F.Supp. 1484 (D.C.Colo. 1985); *Wehner v. Syntex Agribusiness,* 616 F.Supp. 27 (E.D.Mo.1985); *United States v. Ward,* 8 Chem. & Rad.Waste Litig.Rep. 484, 487 (D.N.C. May 14, 1984); *United States v. Northeastern Pharmaceutical and Chemical Co.,* 579 F.Supp. 823, 844–45 (W.D.Mo.1984); *United States v. A & F Materials Co.,* 578 F.Supp. 1249, 1256–57 (S.D.Ill.1984); *United States v. Wade,* 577 F.Supp. 1326, 1338 (E.D.Pa. 1983); *United States v. Chem–Dyne,* 572 F.Supp. 802, 807 n. 3 (S.D.Ohio 1983)." *Mardan Corp. v. C.G.C. Music, Ltd.,* 804 F.2d 1454, 1457 n. 3 (9th Cir.1986). The Ninth Circuit interprets Section 107 to impose joint and several liability; "Section 107 of CERCLA permits the government or a private party who has incurred response costs to bring suit against a PRP to recover those costs. [citation omitted]. Applying federal common law principles, we have interpreted Section 107 as imposing joint and several liability on PRPs whenever the harm caused to a site is indivisible." *Atchison, Topeka & Santa Fe Ry. Co. v. Brown & Bryant, Inc.,* 159 F.3d 358, 362 (9th Cir.1997). "Because liability is joint and several, a defendant PRP in a cost-recovery action under Section 107 may be held fully liable for the entire clean-up costs at a site, despite the fact that the defendant PRP was in fact responsible for only a fraction of the contamination." *Fireman's Fund Ins. Co. v. City of Lodi, California,* 302 F.3d 928, 946 (9th Cir.2002).

"In 1986, Congress amended CERCLA by passing the Superfund Amendments and Reauthorization Act of 1986 ('SARA'), 42 U.S.C. §§ 9601–9675.... SARA added CERCLA § 113(f), which explicitly recognizes a claim for contribution". *Pinal Creek Group v. Newmont Mining Corp.,* 118 F.3d 1298, 1300 (9th Cir.1997). A PRP's contribution liability [under CERCLA § 113(f) ] correspond[s] to that party's equitable share of the total liability ....' *Id.* at 1301. Thus, CERCLA § 107 and CERCLA § 113 provide different remedies: a defendant in a § 107 cost-recovery action may be jointly and severally liable for the total response cost incurred to clean up a site, whereas a defendant in a § 113(f) contribution action is liable only for his or her pro-rata share of the total response costs incurred to cleanup a site. *Fireman's Fund Ins. Co. v. City of Lodi, California,* 302 F.3d 928, 946 (9th Cir. 2002). This is subject to a divisibility analysis.

As the Sixth Circuit has stated, a plaintiff "bringing a cost recovery action ... must prove only that each defendant is a 'liable' party and not that defendants are responsible for a certain share of the plaintiff's response costs. Only if a defendant can affirmatively demonstrate that the harm is divisible, will damages from a cost recovery action brought pursuant to § 107(a) be apportioned according to fault." *Centerior Service Co. v. Acme Scrap Iron & Metal Corp.,* 153 F.3d 344, 348 (6th Cir.1998); *see also United States v. Hercules, Inc.,* 247 F.3d 706, 718 (8th Cir.2001) ("[T]he divisibility doctrine is conceptually distinct from contribution or allocation of damages"); *United States v. Alcan Aluminum Corp.,* 990 F.2d 711, 722 (2d Cir.1993) (recognizing the "common law gloss" that courts have placed on CERCLA strict liability by adding divisibility to the statutory framework of joint

and several liability). *California Dept. of Toxic Substances Control v. Alco Pacific, Inc.*, 217 F.Supp.2d 1028, 1035 (C.D.Cal. 2002). *United States v. Monsanto Co.*, 858 F.2d 160, 173 (4th Cir.1988), *cert. denied sub nom, Monsanto Co. v. United States*, 490 U.S. 1106, 109 S.Ct. 3156, 104 L.Ed.2d 1019 (1989), states that '[w]hile CERCLA does not mandate the imposition of joint and several liability, it permits it in cases of indivisible harm.' (Emphasis added.) *Price v. U.S. Navy*, 39 F.3d 1011, 1018 (9th Cir.1994).

To apportion liability, DTSC contends Barstow must present evidence "showing a relation between 'waste volume, the release of hazardous substances and the harm at the Site.'" Doc. 951 at 22. DTSC asserts this is a difficult burden to meet; DTSC argues Barstow cannot prove the harm is divisible: 1) "the harm at Mobile Smelting Site is not physically divisible into geographical areas;" 2) there is no single contaminant as the Site "contains three significant types of contamination (copper, lead, and dioxins) from several different waste streams that varied widely;" 3) "there is no way to determine the relation between the waste volume, the release of hazardous substances and the contamination at the Site." DTSC recites a long list of fact-intensive reasons why the harm at the Site is indivisible and concludes that "it is impossible to know how much ash each scrap dealer generated in relation to all other scrap dealers unless one knows exactly what type of material each dealer brought to the site and the amount and type of insulation on the material in proportion to the amount of metal." Doc. 951 at 23. DTSC also argues the amount of dioxin generated in ash left at the property depends upon "whether the burn was done in a furnace or on the ground, and what the temperature conditions were during the burn," as well as what type of pollution control devices ex-

isted, the efficiency at which the baghouse operated, and whether any upset events occurred. *Id.* at 24. The relationship between the volume of waste contributed by each defendant and the release of hazardous substances and the harm at the Site is therefore not quantifiable according to DTSC and joint and several liability must be imposed.

Barstow responds the harm is divisible and "there is a reasonable and factual basis, supported by expert testimony and scientific data, for fairly apportioning the harm that was allegedly caused by the parties who brought material to Mobile Smelting." Doc. 972 at 24. Barstow contends Dr. Michael Lakin's expert testimony shows the Site harm is apportionable. The partial deposition provided by Barstow of Dr. Lakin's analysis shows a potentially reasonable and accurate means to apportion the pollution created by the smelting operations at the Site.

DTSC replies by repeating its assertion that Barstow has not met its burden of proof "that the harm on the Site is divisible." Doc. 983 at 13. DTSC attempts to discredit Dr. Lakin's methods by questioning certain aspects of the deposition and Dr. Lakin's assumptions. DTSC next reiterates its discussion of current law on divisibility of harm and burden of proof under CERCLA.

On a motion for Summary Judgment, the evidence must be viewed in light most favorable to the nonmoving party. *Indiana Lumbermens Mut. Ins. Co. v. West Oregon Wood Products, Inc.*, 268 F.3d 639, 644 (9th Cir.2001), *amended by* 268 F.3d 639 (9th Cir.2001). The moving party bears the initial burden of demonstrating the absence of a genuine issue of fact. *Devereaux v. Abbey*, 263 F.3d 1070, 1076 (9th Cir.2001). DTSC has not met this burden; a genuine issue of material

fact exists as to whether Barstow can prove with reasonable certainty, the divisibility of harm to avoid the imposition of joint and several liability under CERCLA.

Motion for Summary Judgment as to Barstow's joint and several liability, versus some apportioned liability, is DENIED.

> (5) *Joint and Several liability re: future costs incurred by the Department in response to the release or threatened release of hazardous substances from the Site*

a. *Bottom Ash*

Triable issues of material fact exist. Summary Judgment as to Barstow's future liability with respect to the Bottom Ash is DENIED.

b. *Dross*

Triable issues of material fact exist. Summary Judgment as to Barstow's future liability with respect to the dross is DENIED.

c. *Battery Parts*

Barstow is strictly liable for response costs at Mobile Smelting as a result of its battery parts related transactions. *See supra*, 56–63. Summary Judgment requesting a declaratory judgment as to Barstow's future liability for response costs, with respect to its battery part transactions, is GRANTED, the nature and extent of releases remains to be determined.

d. *Joint and Several liability*

A genuine issue of material fact exists as to whether Barstow is able to accurately prove the divisibility of harm to avoid the imposition of future joint and several liability under CERCLA. Future joint and several liability may not be declared until present/past joint and several liability is proved.

Motion for Summary Judgment as to Barstow's future joint and several liability is DENIED.

D) *DTSC Motion for Summary Judgment under RCRA*

The California Department of Toxic Substances Control (DTSC) moves for Summary Adjudication on the issue of Barstow's liability under the Resources Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6972. Doc. 949. DTSC requests a determination that it is entitled to an injunction requiring Barstow to take steps to remedy the contamination on the Site. *Id.* at 17. DTSC avers it will "apply to the Court for an Order stating the exact terms of the injunction" at a later time. *Id.*

The relevant portion of RCRA states:

> ... any person may commence a civil action on his own behalf— (1)(B) against any person, including the United States and any other governmental instrumentality or agency, ... and including any past or present generator, past or present transporter, or past or present owner or operator of the treatment, storage, or disposal facility, who has contributed or who is contributing to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment.

42 U.S.C. § 6972(a)(1)(B). "RCRA establishes a 'cradle-to-grave' regulatory structure for the treatment, storage and disposal of solid and hazardous wastes." *Connecticut Coastal Fishermen's Assoc., v. Remington Arms Co., Inc.,* 989 F.2d 1305, 1313 (2d Cir.1993). "Solid wastes are regulated under subchapter IV §§ 6941–49a; hazardous wastes are sub-

ject to the more stringent standards of subchapter III §§ 6921–39b." *Id.* "For a waste to be classified as hazardous, it must first qualify as a solid waste under RCRA." *Id.*

██ For DTSC to succeed on its RCRA claim, DTSC must establish: (1) Barstow was a past or present generator or transporter of solid or hazardous waste or past or present owner or operator of a solid or hazardous waste treatment, storage or disposal facility; (2) Barstow contributed to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and, (3) the solid or hazardous waste in question may present an imminent and substantial endangerment to health or the environment. 42 U.S.C. § 6972(a)(1)(B); *see also Lincoln Properties, Ltd. v. Higgins,* 1993 WL 217429 (E.D.Cal.); *Prisco v. A & D Carting Corp.,* 168 F.3d 593 (2d Cir.1999) citing *ABB Indus. Sys., Inc. v. Prime Tech, Inc.,* 120 F.3d 351, 359 (2d Cir.1997).

### 1. *Generator or Transporter of Solid or Hazardous Waste*

### A. *Definitions*

#### 1) *Solid Waste*

"The term 'solid waste' means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and other discarded material, including solid, liquid, semi solid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities ...." 42 U.S.C. § 6903(27). *See also Association of Battery Recyclers, Inc. v. U.S. Environmental Protection Agency,* 208 F.3d 1047, 1050 (D.C.Cir.2000) citing 42 U.S.C. § 6903(27).

#### 2) *Hazardous Waste*

"Solid wastes are 'considered hazardous if they possess one of four characteristics (ignitability, corrosivity, reactivity, and toxicity) or if EPA lists something as hazardous following a rule-making.'" *Association of Battery Recyclers, Inc. v. U.S. Environmental Protection Agency,* 208 F.3d 1047, 1050 (D.C.Cir.2000) citing *Columbia Falls Aluminum Co. v. EPA,* 139 F.3d 914, 915 (D.C.Cir.1998) (citing 42 U.S.C. § 6921(a), 40 C.F.R. pt. 261). The term "hazardous waste" means a solid waste, or combination of solid waste, which because of its quantity, concentration, or physical, chemical, or infectious characteristics may (1) cause, or significantly contribute to, an increase in mortality or an increase in serious irreversible, or incapacitating reversible, illness; or (2) pose a substantial present or potential hazard to human health or the environment when improperly treated, stored, transported, or disposed of, or otherwise managed. William B. Johnson, LIABILITY UNDER § 7003 OF RESOURCE CONSERVATION AND RECOVERY ACT (42 U.S.C.A. § 6973) PERTAINING TO IMMINENT HAZARDS FROM SOLID OR HAZARDOUS WASTE, 115 A.L.R. Fed. 491 (1993), citing 42 U.S.C.A. § 6903(5).

#### 3) *Treatment*

"The term 'treatment', [sic] when used in connection with hazardous waste, means any method, technique, or process, including neutralization, designed to change the physical, chemical, or biological character or composition of any hazardous waste so as to neutralize such waste or so as to render such waste nonhazardous, safer for transport, amenable for recovery, amenable for storage, or reduced in volume." 42 U.S.C. § 6903(34).

#### 4) *Disposal*

"The term 'disposal' means the discharge, deposit, injection, dumping, spilling, leaking, or placing of any solid waste

or hazardous waste into or on any land or water such that such solid waste or hazardous waste or any constituent thereof may enter the environment will be emitted into the air or discharged into any waters, including groundwaters." 42 U.S.C. § 6903(3).

### B. *Discussion*

It is undisputed that Barstow:

1) Dealt in processable and reusable scrap metal parts which it brought to Mobile Smelting for processing. This includes: (a) scrap aluminum from items such as battery boxes and aircraft parts; (b) miscellaneous irony scrap and gear cases; and (c) insulated copper wire and steel-wrapped wire/cable;

2) The insulated wire that Barstow brought to Mobile Smelting contained copper and/or copper compounds;

3) Barstow extracted terminal posts or tops from batteries, which had copper and lead in them, and brought those parts to Mobile Smelting;

4) Mobile Smelting melted the battery posts and tops to recover the lead in ingot form for Barstow;

5) Barstow brought at least two shipments of "dross" to Mobile Smelting; dross and solder dross contain lead either as an intended ingredient or a contaminant;

6) Mobile's burning of Barstow's insulated copper wire produced ash (both Baghouse and Bottom), which contained copper and/or copper compounds, dioxin and lead and/or lead compounds, the amount of which depended upon a variety of conditions at the Site at the time of the burning;

7) Bottom Ash generated from the incineration of Barstow's insulated wire was left by Barstow at Mobile Smelting;

8) Mobile Smelting sometimes sold the Bottom Ash left at its Site and sometimes left piles of the Ash at the Site.

*See supra,* Undisputed Facts, at 12–24.

DTSC argues the materials Barstow brought to Mobile Smelting meet RCRA's definition of solid waste: "materials are considered solid waste if they are no longer useful for their original purpose but are being recycled for reuse outside of the original manufacturing process." Doc. 949 citing *Connecticut Coastal Fishermen's,* 989 F.2d at 1315; *Comite Pro Rescate De La Salud,* 888 F.2d 180, 187 (1st Cir.1989). DTSC asserts the lead parts Barstow reclaimed from spent batteries for recycling purposes are also considered "solid waste" under RCRA and, for support, cites to *ILCO, Inc.* 996 F.2d at 1126, 1131, *Catellus Development Corp. v. United States,* 34 F.3d 748, 752 (9th Cir.1994) and *L.E.A.D. v. Exide Corp. et. al.,* 1999 WL 124473 at *6 (E.D.Pa.1999), discussed *infra* at 82–84.

Barstow argues RCRA does not apply to Barstow's transactions because it brought no "solid waste" to Mobile Smelting. Barstow contends: 1) its transactions fall under 40 C.F.R. 261.1 and 261.2's "scrap metal" exclusion; 2) battery parts are scrap metal, and; 3) solid waste does not include Bottom Ash or Baghouse Ash. Doc. 972 at 9–12.

### 1) *Scrap Metal is not exempted under the statutory definition of Solid Waste*

Barstow argues the definition of solid waste as described in Title 40, sections 261.1 and 261.2 of the Code of Federal Regulations ("C.F.R."), which excludes certain types of scrap metal, should apply. C.F.R. § 261.2 states, "(a)(1) a solid waste is any discarded material that is not excluded by § 261.4(a) or ...." Section 261.4(a) states, "the following materials are

not solid wastes for the purposes of this part: (13) Excluded scrap metal (processed scrap metal, unprocessed home scrap metal, and unprocessed prompt scrap metal) being recycled." 40 C.F.R. § 261.4(13). Section 261.1 defines "processed scrap metal" as "scrap metal which has been manually or physically altered to either separate it into distinct materials to enhance economic value or to improve the handling of materials. Processed scrap metal includes, but is not limited to, scrap metal which has been bailed, shredded, cheered, chopped, crushed, flattened, cut, melted, or separated by metal type (i.e., sorted), and, fines, drosses, and related materials which have been agglomerated...." 40 C.F.R. § 261.1(10).

Barstow argues the citizen suit provision in RCRA does not define "solid waste," and courts have "merely adopted a definition of 'solid waste' from other provisions of RCRA to allow for a broad reading of the term." Doc. 972. Barstow contends the narrower C.F.R. definition of "solid waste," (contained in § 261.1, 261.2, and 261.4) which includes a scrap metal exclusion, should be applied. Doc. 972 at 9–10. DTSC responds that Barstow's interpretation, regarding which definition of "solid waste" should apply, "ignores all of the relevant case law" on the issue. Doc. 983.

If C.F.R. sections 261.1—261.2 applied to all of RCRA's provisions, Barstow would be correct. However, Barstow ignores § 261.2(b)(1) which states: "the definition of solid waste *contained in this Part applies only to wastes that also are hazardous for purposes of the regulations implementing Subtitle C of RCRA.*" (Emphasis added). *See also* 135 A.L.R. Fed. 197 (1997) ("This definition of solid waste [40 CFR § 261.2(a) & § 261.2(b) ] only applies to hazardous waste under Subtitle C, 40 CFR § 261.1(b)(1).")." Barstow's argument is addressed squarely in *Connecticut*

*Coastal Fishermen's Association v. Remington Arms Co., Inc.,* 989 F.2d 1305 (2d Cir.1993), which analyzes the difference between the statutory definition of "solid waste" under RCRA (42 U.S.C. § 6903) and the regulatory definition of "solid waste" under 40 C.F.R. § 261.1—261.2. "The EPA distinguishes between RCRA's regulatory and remedial purposes and offers a different definition of solid waste depending upon the statutory context in which the term appears." 989 F.2d at 1305. In *Connecticut Coastal Fishermen* the EPA submitted an *amicus* brief and acknowledged the § 261.2(a) *regulatory definition* of solid waste was narrower than the RCRA *statutory definition.*

The Second Circuit recognizes the regulatory definition applies only to Subtitle C, which contains "more stringent handling standards for hazardous waste, [ ] a *subset* of solid waste." 989 F.2d at 1305 (emphasis added). The Second Circuit determined the narrower EPA regulations did not apply to citizen suits brought to abate an imminent hazard to health or the environment:

The regulations further state that the statutory definition of solid waste, found at 42 U.S.C. § 6903(27), applies to 'imminent hazard' lawsuits brought by the United States under § 7003, 42 U.S.C. § 6973. [internal citation omitted]. This statement recognizes the special nature of the imminent hazard lawsuit under RCRA. Currently, RCRA authorizes two kinds of citizen suits. The first, under § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), enables private citizens to enforce the EPA's hazardous waste regulations and—according to 40 CFR § 261.1(b)(1)—invokes the narrower regulatory definition of solid waste. The second type of citizen suit, under § 7002(a)(1)(B), 42 U.S.C. § 6972(a)(1)(B), authorizes citizens to

sue to abate an 'imminent and substantial endangerment to health or the environment.' While the regulations do not specifically mention this second category of citizen suit, regulatory language referring to § 7003 must also apply to § 7002(a)(1)(B) because the two provisions are nearly identical. *Connecticut Coastal Fishermen,* 989 F.2d at 1305 citing 40 C.F.R. § 261.1(b)(2)(ii), *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Auth.,* 888 F.2d 180, 187 (1st Cir.1989), *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990).

The Eastern District of Pennsylvania made a similar determination: "liability under [the imminent hazard citizen suit] may be established by the same standards used to establish liability under § 7003 of RCRA, 42 U.S.C. § 6973." *L.E.A.D. v. Exide Corp.,* 1999 WL 124473 *5 (E.D.Pa.) citing H.R.Rep. No. 98–198 at 53, *reprinted in* 1984 U.S.C.A.A.N. 5576, 5612. The *L.E.A.D.* court recognized that multiple circuits have read RCRA § 7003 and § 7002 expansively. 1999 WL 124473 *5–6 (E.D.Pa.). In particular, "courts have expansively interpreted 'solid waste' in § 7002 of RCRA to be broader than the EPA's regulatory definition of solid waste for its Subtitle C regulatory RCRA program". *Id.* citing *Connecticut Coastal Fishermen's v. Remington Arms,* 989 F.2d 1305, 1316 (2d Cir.1993); *Owen Electric Steel Co. of South Carolina v. Browner,* 37 F.3d 146, 148 n. 3 (4th Cir.1994); *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.,* 888 F.2d 180, 187 (1st Cir.1989).

While the Ninth Circuit has not addressed the difference between the statutory and regulatory definitions of "solid waste," it has relied upon the statutory definition in a RCRA violation case: "Solid Waste" is defined as "discarded material." *United States v. Holderness,* 4 F.3d 723, 728 (1993) (dealing with criminal permit violation) citing to 42 U.S.C. § 6903(27) ("The term 'solid waste' means any garbage, refuse, sludge ... and other discarded material."). The Ninth Circuit does not turn to the regulatory definition of solid waste, and refers to 40 C.F.R. § 261.2(a)-(b) only when outlining the EPA's definition of "discarded material" and "hazardous material." The Ninth Circuit's use of the statutory definition in *Holderness* is not controlling, as the case dealt with criminal RCRA violation and not a citizen suit; however, it is instructive.

The Eastern District of California has discussed this issue in a slightly different context, a RCRA commercial sewage contamination case:

> Section 261.4 was promulgated pursuant to Subtitle C of RCRA... As the First Circuit explained, defining 'solid waste' more narrowly for purposes of Subtitle C than for purposes of the § 7002 and 7003 [42 U.S.C. § 6972, 6973] may make sense. Subtitle C contains highly detailed record keeping, notification, and permit requirements; ... Section 7002 and 7003, on the other hand, are invoked only to respond to imminent and substantial endangerment as to health or the environment.

*Lincoln Properties v. Higgins,* 1993 WL 217429 * 11 (E.D.Cal.) citing *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct and Sewer Authority,* 888 F.2d 180, 187 (1st Cir.1989) *cert. denied,* 494 U.S. 1029, 110 S.Ct. 1476, 108 L.Ed.2d 613 (1990). *Lincoln* was a sewage contamination case, which dealt with defendants attempting to narrow the definition of "Solid Waste" by arguing for a domestic sewage exclusion to avoid RCRA liability. The court refused to narrow RCRA's citizen suit applicability. The *Lincoln* court noted, "Congress intended that the scope of

RCRA's injunctive relief provision be broad." 1993 WL 217429 *10 (E.D.Cal.).

Other Circuits concur that the statutory definition of "solid waste" is broader than the regulatory definition and the statutory definition applies, except under Subtitle C. *Connecticut Coastal Fishermen's v. Remington Arms,* 989 F.2d 1305, 1316 (2d Cir. 1993); *Owen Electric Steel Co. of South Carolina v. Browner,* 37 F.3d 146, 148 n. 3 (4th Cir.1994); *Comite Pro Rescate De La Salud v. Puerto Rico Aqueduct & Sewer Auth.,* 888 F.2d 180, 187 (1st Cir.1989).

Barstow's argument that scrap metal is exempted from RCRA is rejected. DTSC's suit was not brought under Subtitle C, it was brought under Section 6972, RCRA's "imminent hazard" citizen suit provision. Doc. 949 at 9. RCRA's general definition of "solid waste," contained in 42 U.S.C. § 6903(27) applies.

### 2) *CERCLA'S § 127 recycling exemption does not apply to RCRA*

Barstow argues that CERCLA's § 127 recycling exemption should be applied to similar RCRA transactions. Barstow contends that because "congressional intent [ ] demonstrates that through Section 127 *bona fide* recycling transactions are properly exempt from CERCLA liability," the same transactions, "should also be exempt from RCRA." Doc. 972 at 4.

DTSC correctly argues the court may not amend RCRA to exempt recycling transactions. When Congress amended CERCLA, it could have amended RCRA to provide the recyling exemption, but did not. The court has no power to read into the statute language which is not there. RCRA does not contain a recycling exemption.

### 3) *Battery Parts are Solid Waste*

Barstow contends the battery parts it took to Mobile Smelting "were simply processed scrap materials that happened to be taken from batteries" and are subject to the C.F.R. scrap metal exemption. Barstow argues that because it brought battery parts, "as opposed to whole batteries," its transactions are "subject to the scrap metal exemption and should be considered 'complete useful products.'" Doc. 972 at 10–11. Barstow's argument fails because the scrap metal exemption contained in the narrow "solid waste" definition of 40 C.F.R. 261.1 and 261.2, does not apply as discussed, and battery parts meet the definition of "solid waste" under RCRA.

A number of courts have found reclaimed and recycled battery parts "solid waste." In *ILCO,* the Eleventh Circuit held batteries and their contents were solid waste: "lead plates and groups [reclaimed] from spent batteries fall squarely within the law and regulations governing the storage, disposal and treatment of hazardous waste." 996 F.2d at 1126. The defendants in *ILCO* argued that battery parts were not "discarded" and therefore did not come within RCRA's definition of "solid waste." *Id.* at 1131. The Eleventh Circuit rejected this line of reasoning: "*somebody* has discarded the battery in which these components are found. This fact does not change just because a reclaimer has purchased or finds value in the components." *Id.* The Eleventh Circuit observed that the "secondary character" of battery parts as "recyclable material" was irrelevant to the "discarded" determination. *Id.* at 1132 citing *AMC I,* 824 F.2d at 1192–93 and *AMC II,* 907 F.2d at 1186–87. *ILCO* also cites EPA regulation 57 Fed.Reg. 960–61 (Jan. 9, 1992) for support: the EPA has interpreted [battery] plates and groups as solid waste under these regulations for five years ... ("with regard to lead plates and groups, the materials are solid wastes under the federal reg-

ulations because they are spent materials being reclaimed."). The Eleventh Circuit recognizes the EPA's application of its own regulation is "entitled to substantial deference." 996 F.2d at 1132 citing *Borden v. Meese*, 803 F.2d 1530, 1535 (11th Cir.1986) ("Courts accord great deference to the interpretation of statutes and regulations by the agency charged with administering that regulatory scheme.").

In *Catellus*, the Ninth Circuit adopts the Eleventh Circuit's *ILCO* decision that lead components recovered from spent batteries are considered "waste" under EPA's Solid Waste Disposal Act regulations 40 C.F.R. § 261.2. *Catellus v. United States*, 34 F.3d 748, 752 citing 40 C.F.C. § 261.2(a)(2) (1993), 40 C.F.C. § 261.2(c)(4) (1993), 40 C.F.C. § 261.2(e) (1993). In *L.E.A.D. v. Exide Corp*, the Eastern District of Pennsylvania held, "[l]ead scrap and lead-acid batteries which are to be recycled are considered 'discarded' solid waste" [under RCRA].1999 WL 124473 *7 (E.D.Pa.1999). Barstow's battery part related transactions are "solid waste" under RCRA.

### 4) *Dross*

■ Barstow argues that DTSC cannot prove what type of dross Barstow brought to Mobile Smelting. Doc. 972 at 11. Barstow contends the dross at issue can be classified as processed scrap metal and is excluded from the definition of solid waste. Scrap metal is not excluded from RCRA's statutory definition of solid waste. " 'Solid waste' means any garbage, refuse ... *and other discarded material,* including solid, liquid, semi solid, or contained gaseous material resulting from industrial, commercial, mining, and agricultural operations, and from community activities." 42 U.S.C. § 6903(27) (emphasis added). *See also Association of Battery Recyclers, Inc.*

*v. U.S. Environmental Protection Agency,* 208 F.3d 1047, 1050 (2000).

■ RCRA does not define "other *discarded* material." Courts have interpreted "discarded" to include material which is "recovered" and put to another use in another industry, *i.e.* "recycled." The Second Circuit cites to RCRA's legislative history:

The reach of RCRA was intended to be broad. 'It is not only the waste by-products of the nation's manufacturing processes with which the committee is concerned: *but also the products themselves once they have served their intended purpose and are no longer wanted by the consumer.* For these reasons the term discarded materials is used to identify collectively those substances often referred to as industrial, municipal or post-consumer waste; refuse, trash, garbage and sludge.

*Connecticut Coastal Fishermen's Association,* 989 F.2d at 1314 (emphasis added). The Eleventh Circuit has held: "it is unnecessary to read into the word 'discarded' a congressional intent that the waste in question must finally and forever be discarded ... it is perfectly reasonable for EPA to assume Congress meant 'discarded once.' ... previously discarded solid waste, although it may at some point be recycled, nonetheless remained solid waste." *ILCO*, 996 F.2d at 1132 citing *American Petroleum*, 906 F.2d at 741 (holding that "discarded" material sent by steel mills to a metal recovery facility remained a solid waste in the hands of the metal recoverer); and *American Mining Congress v. EPA*, 907 F.2d 1179, 1186–87 (D.C.Cir.1990) (*AMC II*) (materials awaiting recycling may be classified as "discarded," whether the materials were discarded by one user and sent to another for recycling, or stored before recycling by the

person who initially discarded them in land disposal units).

Barstow admits the dross it brought to Mobile Smelting is, at a minimum, "scrap metal," which was processed by Mobile Smelting in order to recover the lead from the Dross. "Scrap" is defined as "a small piece or portion; fragment ... an old, discarded, or rejected item or substance for use in reprocessing or as raw material, as old metal that can be melted and reworked... Chips, cuttings, fragments, or other small pieces of raw material removed, cut away, flaked off, etc., in the process of making or manufacturing an item." Random House Webster's Unabridged Dictionary, Second Edition, 1998, New York. "Scrap metal" is a "discarded material."

The dross Barstow brought to Mobile Smelting is "solid waste" as defined in 42 U.S.C. 6903(27) and subject to RCRA.

### 5) *Bottom Ash*

DTSC alleges the Bottom Ash by-product of Barstow's scrap material, processed at Mobile Smelting and left there by Barstow, is similar to sludge or slag and constitutes a waste product under RCRA. To support this proposition DTSC cites to *American Mining Congress*, 907 F.2d at 1179, 1185 ("discarded" slag material sent to metal recovery facility is solid waste), and *Owen Electric Steel*, 37 F.3d at 150 (slag being accumulated for six months before being sold is discarded material and therefore solid waste under RCRA).

Barstow contends Ash is not defined as "solid waste" under RCRA. Barstow argues DTSC cannot prove the Ash found at the Site is "related in any way to the material sent by Barstow for processing." Doc. 972 at 11. Barstow asserts that, because Mr. Huffman frequently sold large piles of Ash for economic value, there is no evidence to establish the remaining piles of Ash come from Barstow's transactions. Barstow alleges it last sent materials to the Site no later than 1983, the Site was shut down by a County environmental agency between 1983 and 1986, and, therefore it is highly unlikely that any Ash found on the Site can be connected to the material sent by Barstow for processing. Doc. 972 at 11. Barstow also contends slag and sludge (solid waste) are distinguishable from Ash because neither sludge nor slag has economic value. Barstow argues that ash does not have to be held in holding bays for months before it has to be removed, and Barstow "was not engaged in activities comparable [to the slag and sludge cases]." Doc. 972 at 12.

Bottom Ash is similar to slag as Bottom Ash is a by-product of the smelting business. *See Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir.1994) ("Slag ... is at best a by-product. ASARCO's principal business is the smelting of copper ... slag ... [is a] by-product[ ] with a nominal commercial value... ASARCO had dumped slag in Commencement Bay for years before that means of disposal became infeasible."). Barstow's assertion that Ash is different than Slag because Slag has no economic value is incorrect; just as ash was sold to fertilizer companies, slag was resold to the construction and logging industry. *See Louisiana–Pacific Corp. v. ASARCO, Inc.*, 24 F.3d 1565 (9th Cir.1994). Mr. Huffman sometimes sold Bottom Ash to be shipped overseas for fertilizer and he sometimes gave the Ash away. The ash also piled up on the property (at one point a pile was "one to two acres, three to six feet high"). Barstow's attempt to distinguish Ash from sludge or slag fails. Ash and slag are by-products of the copper smelting industry. That slag is sometimes left in holding bays for months has no relevance to whether or

not Ash is an industry by-product similar to slag.

Bottom Ash is Solid Waste under RCRA. The term "solid waste" means any garbage, refuse, sludge from a waste treatment plant, water supply treatment plant, or air pollution control facility and *other discarded material,* including solid, liquid, semi solid, or contained gaseous material *resulting from industrial, commercial,* mining, and agricultural *operations,* and from community activities . . . ." 42 U.S.C. § 6903(27) (emphasis added). It is undisputed that Bottom Ash was created as a by-product of Mobile Smelting's incineration process, an industrial or commercial operation. *See* UF 14–16,19 *supra* at 22–23. It is also undisputed that Barstow retained ownership of the Bottom Ash created from the various metals it brought to Mobile Smelting. *See* UF 14–16,19 *supra* at 22–23; *see also, Courtaulds Aerospace v. Huffman,* 826 F.Supp. 345, 354 (E.D.Ca. 1993) ("Huffman's statements can be fairly interpreted as meaning that scrap dealers owned the Ash at least until the time they gave or sold it to him."). It is undisputed that Barstow chose to *leave* the Bottom Ash at Mobile Smelting. *See* UF 14–16,19 *supra* at 22–23. By leaving the Bottom Ash at Mobile Smelting, Barstow "discarded" the material under RCRA. *See Courtaulds Aerospace v. Huffman,* 826 F.Supp. 345, 353 (E.D.Ca.1993) ("the dispositive inquiry is whether (the defendants) intended to otherwise dispose of hazardous waste. [citation omitted]. By leaving the ash with Huffman, moving defendants rid themselves of the ash.").

Based on the foregoing, Barstow is a "past generator . . . or transporter of solid or hazardous waste" under RCRA. The amount of ash Barstow introduced to the Site and was released to the environment remains to be proved.

### 2. *Contribution to the Handling or Storage*

DTSC must show Barstow "contributed . . . to the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste which may present an imminent and substantial endangerment to health or the environment." 42 U.S.C. § 6972(a)(1)(B).

DTSC asserts that "courts have held [ ] the terms 'contributed to' in RCRA are to be interpreted broadly to apply to those who create solid waste or handling or provide a final resting place for it . . . regardless of fault or negligence." Doc. 949 at 12 citing *U.S. v. Aceto Agricultural Chemicals,* 872 F.2d 1373, 1382 (8th Cir.1989); *Aurora National Bank v. Tri Star Marketing, Inc.,* 990 F.Supp. 1020, 1028 (N.D.Ill.1998); *Zands v. Nelson,* 779 F.Supp. 1254, 1263–64 (S.D.Cal.1991); *United States v. Northeastern Pharmaceutical & Chemical Co. Inc.,* 810 F.2d 726, 740 (8th Cir.), *cert. denied,* 484 U.S. 848, 108 S.Ct. 146, 98 L.Ed.2d 102 (1987). DTSC argues Barstow "contributed to the handling of solid waste," because Barstow brought solid waste scrap materials to Mobile Smelting and paid Mobile Smelting to burn the materials and discard the insulation and other non-usable portions of the scrap. "Inherent in the processing was the generation of hazardous waste . . . Barstow retained ownership of the Bottom Ash and could have removed it from the Site, but chose, instead, to leave it on the Mobile Smelting Site." Doc. 949 at 13.

Barstow contends it did not "contribute[ ] to the handling, treatment, storage or disposal of solid waste," because "battery parts and dross are scrap metal" subject to the scrap metal exemption. The scrap metal exemption does not apply to citizen suits under § 6972. Barstow asserts there is insufficient scientific evidence to show the site was contaminated

from Ash and any Ash it left at the Site "would have been removed long before the site was shut down by the DTSC in 1990." Doc. 972 at 12.

Barstow correctly asserts that the phrase "contributed to" the contamination on-site suggests "some level of causation between the contamination and a party to be held liable." *Id.* citing *Hudson River-keeper,* 138 F.Supp.2d at 487. It is not enough that Barstow contributed to solid waste that was handled, treated, stored or disposed of at Mobile Smelting. To be liable under RCRA, Barstow's "contribution" must be causally connected to the possibility of an "imminent and substantial endangerment."[8] The liability part of § 6972 applies to: "any person ... who has contributed to ... the past or present handling, storage, treatment, transportation, or disposal of any solid or hazardous waste *which may present an imminent and substantial endangerment to health or the environment.*"

DTSC must connect Barstow's transactions with the contamination that creates the imminent and substantial endangerment ("ISE"). The Ash produced at Mobile Smelting was a byproduct of the incineration process used to separate valuable metal from insulation. *See* UF 14–16,19 *supra* at 22–23. Mr. Huffman gave his clients the opportunity to take the Bottom Ash with them or leave it at the site. *See* UF 19 *supra* at 23. Barstow chose to leave the Bottom Ash produced by Barstow's transactions at the site. Bottom Ash created from Barstow's transactions was "discarded" by Barstow.[9] However, whether or not such Ash remained at and contaminated the site, or was immediately sold by Huffman, is an unproved and disputed material fact that goes to the issue of whether or not such actions by Barstow contributed to a possible "imminent substantial endangerment." Additionally, any other actions by Barstow, such as the quantity of Baghouse Ash left onsite or the probable amount of pollutants created by Barstow's transactions, could be (but have not been) shown to connect Barstow's transactions to an ISE.

Barstow correctly asserts DTSC must show Barstow's actions "could have contaminated the soil." Doc. 972 at 13. However, Barstow's assertion that DTSC "must show that the ash generated by processing Barstow materials could not have been removed from the site prior to the filing of their motion for partial summary judgment," is incorrect. DTSC is not limited to proving existing ash piles include Barstow materials. The Mobile Smelting Site is contaminated in multiple ways. The polymer coating has been applied to six acres of soil, in addition to the remaining ash piles. If DTSC can show Barstow's actions contributed to the contamination which is currently being contained due to ongoing imminent and substantial endangerment ("ISE") designation, DTSC can meet its causation burden.

DTSC must show the causal connection between Barstow's actions and the current on-site contamination warranting the ISE. It is not enough for DTSC to show that at some point Barstow engaged in some transactions with Mobile Smelting which resulted in the presence of some amount of

8. This analysis follows the order of DTSC's motion and RCRA language. Whether an Imminent and Substantial Endangerment "may exist" at the Site is addressed in the next section, *infra,* at 92–100.

9. Under DTSC's CERCLA claim, this Order denies summary judgment as to the Bottom Ash issue, and holds a trial is required. The holding is irrelevant to DTSC's RCRA claim. There is no comparable § 127 recycling exemption under RCRA.

Baghouse and Bottom Ash waste at the Site. A material fact dispute exists as to whether or not *Barstow's* transactions contributed to the current ISE.

### 3. *Imminent and Substantial Endangerment* [10]

■ Section 6972(a)(1)(B) authorizes injunctive relief where the site conditions "may present an imminent and substantial endangerment to health or the environment." *Lincoln Properties* notes that because "the word 'may' precedes the standard of liability" Congress included expansive language intended "to confer upon the courts the authority to grant affirmative equitable relief to the extent necessary to eliminate *any risk* posed by toxic wastes." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 *12(E.D.Cal.) citing *Dague v. City of Burlington*, 935 F.2d 1343, 1355 (2nd Cir.1991) (quoting *United States v. Price*, 688 F.2d 204, 213–14 (3rd Cir.1982.)) (emphasis in *Dague*), *rev'd in part on other grounds*, 505 U.S. 557, 112 S.Ct. 2638, 120 L.Ed.2d 449 (1992) (internal quotation marks omitted).

■ " 'Endangerment' means a threatened or potential harm and does not require proof of actual harm." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *Dague*, 935 F.2d at 1356. "Endanger means something less than actual harm. When one is endangered, harm is *threatened;* no actual injury need ever occur." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 *12 (E.D.Cal.) *citing Ethyl Corp. v. Environmental Protection Agency*, 541 F.2d 1, 13 (D.C.Cir.1976), *cert. denied*, 426 U.S. 941, 96 S.Ct. 2662, 49 L.Ed.2d 394 (1976) (internal quotation marks omitted).

■ "A finding of 'imminence' does not encompass a showing that actual harm will occur immediately so long as the risk of threatened harm is present." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 *13 (E.D.Cal.) citing *Dague*, 935 F.2d at 1356; *see also Conservation Chemical*, 619 F.Supp. at 193 ("An endangerment need not be immediate to be 'imminent,' and thus warrant relief"). "An endangerment is 'imminent' if factors giving rise to it are present, even though the harm may not be realized for years." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *Conservation Chemical*, 619 F.Supp. at 193–94.

■ " 'Substantial' does not require quantification of the endangerment (*e.g.,* proof that a certain number of persons will be exposed, that 'excess deaths' will occur, or that a water supply will be contaminated to a specific degree) .... endangerment is substantial if there is some reasonable cause for concern that someone or something may be exposed to a risk of harm by a release or a threatened release of a hazardous substance if remedial action is not taken." *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *Conservation Chemical*, 619 F.Supp. at 194. "Injunctive relief should not be granted," however, " 'where the risk of harm is remote in time, completely speculative in nature, or *de minimis* in degree.' " *Lincoln Properties, Ltd. v. Higgins*, 1993 WL 217429 (E.D.Cal.) citing *United States v. Reilly Tar & Chemical Corp.*, 546 F.Supp. 1100, 1109 (D.Minn. 1982) (quoting H.R.Rep. No. 1185, 93rd Cong., 2nd Sess. 35–36, *reprinted in* 1974

---

**10.** DTSC moves to exclude Barstow's expert declaration of Dr. Lakin re: the Imminent and Substantial Endangerment Designation. Doc. 993. In the alternative, DTSC objects to most of Dr. Lakin's declarations. Doc. 987. Barstow opposes these motions. Doc. 998, 999, 1001. DTSC's motions are denied. *See infra* at 100.

U.S.Code Cong. & Ad. News 6454, 6487–88).

■ Twelve years ago, on October 31, 1990, the department issued an Imminent and Substantial Endangerment Determination regarding the Mobile Smelting Site. UF 31. DTSC asserts the site remains an imminent and substantial endangerment to health and the environment because much of the remediation efforts are temporary. Doc. 949 at 15. DTSC's expert, Mr. Kovac, testifies that:

[C]ontamination [continues to] exist on the Site and on neighboring properties:

a. The soil on the Site itself is contaminated with high levels of copper, lead, and dioxin. These levels are substantially above the levels permitted for an industrial site.

b. The soil off-site is contaminated with high levels of lead, copper, and dioxin. The levels are substantially above the levels permitted for an industrial site.

c. The Site contains piles of Bottom Ash that contain high levels of copper and lead, as well as dioxins. These levels of contaminants are hazardous.

d. The Site contains bags of Baghouse Ash that contain percentage levels of dioxin, the highest levels ever seen in the state of California. These levels of contaminants are hazardous.

Based upon personal observation, high wind conditions, a review of the data contained in Chaney, Walton and McCall's Remedial Investigation report, and department policies relating to ISE designations, Mr. Kovac asserts "the Mobile Smelting Site and neighboring off-site areas constitutes a continuing imminent and substantial endangerment to human health and the environment." Doc. 957 ¶ 26, at 8. Mr. Kovac asserts the threat is neither remote or speculative in nature, nor de minimis in degree. *Id.* Mr. Kovac contends harm has already occurred and is not simply threatened, as contamination has been widely spread throughout the environment. *Id.* Additionally, the Site is an ISE because the remediation efforts performed to date include temporary actions which will fail if not renewed or made permanent. *Id.* ¶¶ 21–25 at 7–8. It is undisputed that soil and ash piles on site are covered with polymer coating that is 1/4 to 1/2 inches thick and the polymer coating is only a temporary cap, which must be renewed approximately every two years. UF 32. It also is undisputed that if the polymer is not renewed, "it will break down and the contaminated sod and ash on the site will be exposed to wind and rain, and the contamination can be spread." UF 32.

Barstow contends the site does not present an imminent and substantial endangerment because DTSC: 1) "failed to scientifically establish whether potential risk of harm exists at the site and whether the risk of harm is caused by its operations;" 2) DTSC's temporary corrective measures "serve as an effective barrier to prevent potential exposure to the nearest residents;" and, 3) "the potential risk of harm from the Mobile Site is 'completely speculative in nature' and 'de minimis in degree'." [sic] Doc. 972 at 4–5.

Barstow's assertion that "DTSC has failed to meet the initial threshold by failing to scientifically establish whether a potential risk of harm exists at the Site and whether that harm was caused by the operations at the Site" is specious. There is no dispute, based upon the record, that an ISE existed in 1990 and that the harm at the site was caused by Mobile Smelting's operations. DTSC has documented, through multiple scientific reports by qual-

ified experts, that the contamination was caused by Mobile Smelting's operations. *See* TetraTech report contained in Declaration of Ruben Medina in support of Motion for Summary Judgment re: Insurance Coverage, Doc. 1034, Exh. B at 1; Chaney, Walton & McCall Remedial Investigation Summary Report contained in Declaration of Thomas W. Kovac in Reply to Defendants Oppositions, filed July 26, 2002, Doc. 989, Exh. A at I; Kern County Records of pollution problems at Mobile Smelting from 1971–1981 in Declaration of Louise Roman, Doc. 1032; ERCE at DTSC 1953 in Declaration of Louise Roman, Doc. 1032. At the October 18, 2002 hearing, the court stated, "but as to the release, again, we have the presence of heavy metals. We have the presence of other toxins on the site that are being dealt with, and ... I don't think [it] is reasonably subject to dispute that the burning activities through the years of the site owner and operator, [Mr. Huffman] are the means by which those releases of what are identified as hazardous substances came about." *Id.* at 12:13–19. It was established at the October 18, 2002 hearing that Mobile Smelting caused the harm which exists at the Site.

As to whether Mr. Kovac's opinion that the Site currently presents an imminent and substantial endangerment is valid, Dr. Lakin opines:

the analysis presented by the DTSC is fundamentally flawed. It incorporates data that are improper for determining or evaluating potential exposure(s) for conducting an endangerment analysis.

These data were collected using a biased analysis decision technique that ensures only the worst data are presented and incorporated into their analysis. These data are further biased by the sampling technique, which incorporates non-representative materials; these non-representative materials cause an overestimate of the amount of chemicals which are present in site soils that could migrate from the site, and those chemicals that are present in site soils.

Doc. 987, ¶ 7 at 3. The consequence of this allegedly flawed process is that, "the conclusions reached in Mr. Kovac's analysis are highly uncertain and speculative at best or completely erroneous at worst." *Id.* ¶ 12 at 3. Some of Dr. Lakin's comments contradict his earlier report as well as other Barstow expert opinions [11] and is suspect. However, Dr. Lakin's testimony that Mr. Kovac used flawed methodology creates a triable issue of material fact as to whether an Imminent and Substantial Endangerment currently exists.

Barstow also contends DTSC's temporary corrective measures "serve as an effective barrier to prevent potential exposure to the nearest residents." Furthermore, "those items which did present an ISE back in 1990, such as all contaminated equipment ... have been decontaminated, dismantled, and removed from the site. All scrap metal also has been removed, and all offsite contaminated soils and ash have been consolidated on-site." Barstow argues the polymer coating, when renewed as required, creates a

---

11. For example, Dr. Lakin's Expert Report asserts: "the presence of hazardous substances, and dioxins/furans and heavy metals attributable to operations at the Mobile Smelting Site constitute an environmental "harm" potentially warranting a response action. Doc. 983 at 4 citing Report of Michael Lakin, January 30, 2002 (attached as Exh. C. to declaration of Susan S. Fiering in Reply to Oppositions to Motions for Partial Summary Judgment). This contradicts Dr. Lakin's current declaration that, "even if the site were not covered, it is not clear that the site would pose a significant risk, or that any remedial work is required," Doc. 973 at ¶ 37, and "no data presented by Mr. Kovac demonstrate that chemicals detected on or off site are indeed site-related." Doc. 973 at ¶ 31.

sufficient barrier to further contamination. Doc. 972 at 7–9. Dr. Lakin posits, "even if the site were not covered, it is not clear that it would pose a significant risk, or that any remedial work is required." Doc. 973 at ¶ 37. Dr. Lakin's statement is contradicted by Barstow's admission that, "[t]he polymer coating is only a temporary cap that will last about two years and must be renewed. If it is not renewed, it will break down and the contaminated sod and ash on the site will be exposed to wind and rain, and the contamination can be spread." *See* UF 32. DTSC's expert, Mr. Kovac, contends that, "without the polymer coating, the contaminated soil could be spread to neighboring properties. The polymer coating is temporary however, and if not renewed every few years, will break down, exposing the contaminated soil. Once soil is exposed it can be further spread through the action of the wind." Doc. 957 ¶ 21 at 7. *Id.* ¶ 26 at 8. It is undisputed DTSC's containment measures dealing with contaminated soil and ash piles on Site are temporary and should they not be renewed, contamination will spread. Dr. Lakin's opinions that this highly contaminated site has no potential to create current or future risk were so partisan as to approach the ridiculous. However, credibility cannot be decided on this motion.

Barstow's expert contends "the potential risk of harm from the Mobile site is 'completely speculative in nature' and 'de minimis in degree'." [sic] Doc. 972 at 9. DTSC's expert disagrees: "the site, and its current condition, presents a risk of threatened harm to the environment and to people living, working and traveling in the vicinity of the Site. This threat of harm is not remote or speculative in nature." Doc. 957 ¶ 26, at 8. Both experts are qualified to testify on the issue. Their disagreement creates a triable issue of material fact as to whether the Site currently "may present an imminent and substantial endangerment to health or the environment."

DTSC's motion for summary judgment as to RCRA liability is DENIED.

### 4. *Evidentiary Disputes*

#### a. *DTSC's Motion to Exclude*

 DTSC moves to exclude Dr. Lakin's declaration under Rule 37 of the Federal Rules of Civil Procedure, alleging Dr. Lakin was not properly disclosed as an initial Barstow expert or as a rebuttal expert on the issue of imminent and substantial endangerment. DTSC also alleges Dr. Lakin did not submit an expert report on this issue, as required by Rule 26(a) and (e) of the federal Rules of Civil Procedure. Barstow opposes this motion; Barstow contends it designated Dr. Lakin as a rebuttal witness in its expert witness report provided to DTSC January 31, 2002. Barstow's purported disclosure lists Dr. Michael Lakin as follows

> Dr. Lakin has been retained by Barstow to provide expert testimony in this case. A disclosure statement prepared by Dr. Lakin pursuant to FRCP 26(a)(2) has been served on all parties. Dr. Lakin also will present *supplemental evidence* with respect to the concentration levels and nature of hazardous substances present at the Mobile Smelting Site, and with *respect to the anticipated testimony and evidence of Dr. Camille Sears.*

Doc. 999 at 2; Doc. 984, Exh. E at 2.

Barstow's disclosure states that Dr. Lakin will "present supplemental evidence with respect. to the concentration levels ... and with respect to the anticipated testimony and evidence of Dr. Camille Sears." *Id.* It does *not* state Dr. Lakin is

a rebuttal witness to Mr. Kovac. However, Dr. Lakin's declaration is focused *entirely* on rebutting Mr. Kovac. Barstow's witness disclosure provides no rebuttal witnesses for Mr. Kovac. Barstow's witness list does include Dr. Paolo Zanetti and Dr. Berry Belanger as witnesses who will "present supplemental evidence with respect to the anticipated testimony and evidence of . . . Tom Kovac." Doc. 984 ¶¶ 1–2 at 2.

Barstow did not adequately or timely notify DTSC that Dr. Lakin would be rebutting Mr. Kovac's testimony, as required by Federal Rule of Civil Procedure Rule 26(a)(2) and 26(a)(2)(B). Dr. Lakin's declaration is a rebuttal declaration; it is not a supplement to his initial report under FRCP 23(e)(1). As a rebuttal, Dr. Lakin's declaration also violates FRCP 26(a)(2)(C), as it was not submitted within 30 days after Mr. Kovac was deposed on May 9, 2002.

Barstow alleges it has not received any documents, as required by Rule 26(a)(2), regarding Mr. Kovac's expected expert witness testimony on the Imminent Substantial Endangerment ("ISE") Site issue. Barstow contends it attempted to have Dr. Lakin deposed before Mr. Kovac, but DTSC refused. Doc. 999 at 3. Barstow argues DTSC was aware Dr. Lakin would be testifying as to the Site's ISE status as early as May 7th, 2002. *Id.* DTSC questioned Dr. Lakin regarding his opinion as to the Site's ISE status during Dr. Lakin's deposition on May 7, 2002. *Id.*

Barstow's actions violate the Federal Rules of Civil Procedure. However, DTSC was informed of Dr. Lakin's intent to testify on the ISE issue at least as early as May 7, 2002. A party "that without substantial justification fails to disclose information required by Rule 26(a) shall not, unless such failure is harmless, be permitted to use as evidence at trial any information not so disclosed." FRCP 37(c)(1). DTSC was capable of objecting to Dr. Lakin's testimony any time after May 8, 2002. DTSC had ample opportunity to prepare for Dr. Lakin's testimony, move to re-depose Dr. Lakin, or move that Dr. Lakin be forbidden from testifying as to the ISE. Barstow's failure to disclose information is harmless. DTSC cannot now claim "foul," as a strategic move to exclude Dr. Lakin's testimony.

DTSC's motion to exclude Dr. Lakin's testimony is DENIED.

### b. *DTSC's Evidentiary Objections*

█ In the alternative, DTSC objects to most of Dr. Lakin's opinions, charging speculation, conclusory opinion, lack of personal knowledge, and lack of factual support. Doc. 987. Barstow opposes DTSC's objections and asserts "as stated in ¶ 6 of his declaration, Dr. Lakin possessed and relied upon copious amounts of factual data as a basis for his opinion . . . based on the same documents used by the DTSC in its analysis of the Mobile Smelting Site." Doc. 1001 at 2.

DTSC objects to Dr. Lakin's declarations at paragraphs 7, 12, 18, 22–24, 27–33, 35–37, because "[Dr. Lakin] fails to provide the factual basis for the opinion[s], as is required by FRCP 56(e)." Doc. 987 ¶¶ 3, 8, 13, 16–18, 21–30. DTSC cites for support, *Guidroz–Brault v. Missouri Pac. R.R. Co.,* 254 F.3d 825, 831 (9th Cir.2001) ("[t]he factual basis for the expert's opinion must be stated in the expert's affidavit."). *Id.* In *Guidroz–Brault,* three experts based their opinions upon a factual assumption which had "no support in the physical facts as described by the reports and other evidence in the record." *Id.* at 830. *Guidroz–Brault* is distinguishable; it involved expert opinions based upon pure speculation with absolutely no factual support in the record. " 'In the context of the

motion for summary judgment, an expert must back up his opinion with specific facts.'" The factual basis for the expert's opinion must be stated in the expert's affidavit, the underlying factual details "need not be disclosed in the affidavit." The underlying facts, however, "must exist." *Id.* at 830 citing *Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1318 (9th Cir.1985).

In *Bieghler v. Kleppe,* 633 F.2d 531 (9th Cir.1980), the court held that an affidavit, which "gave more than a bare conclusion that defendants had been negligent and that their negligence caused the accident" was admissible. The court did note however, that defendants had not moved to strike or otherwise object to the affidavit. Citing to *Bieghler,* the Ninth Circuit held in *Bulthuis* that an "expert opinion is admissible... if it appears the affiant is competent to give an expert opinion and the factual basis for the opinion is stated in the affidavit, *even though* the underlying factual details and reasoning upon which the opinion is based are not." *Bulthuis v. Rexall Corp.,* 789 F.2d 1315, 1318 (9th Cir.1985) (emphasis added). The court recognized that, "if further facts are desired, the movant may request and the District Court may require their disclosure."

DTSC's objections to paragraphs 7, 12, 18, 22–24, 27–33, 35–37 are OVERRULED. Dr. Lakin states that he relies upon:

> numerous site-related and general background documents in preparation for drafting this declaration. These documents include, but are not limited to the DTSC public notices and Fact Sheets sent to local residents, Chaney, Walton and McCall reports, TetraTech reports, URS reports, Metcalf and Eddy reports, Guidance documents, the EPA draft reassessment of dioxins, declarations by plaintiff and defense experts

and attorneys, depositions of experts and witnesses and expert reports.

Doc. 973 ¶ 6, at 2. Under *Bieghler* and *Bulthuis,* Dr. Lakin's testimony is admissible. Dr. Lakin is a qualified expert in the field and the factual basis for his opinion is stated in his affidavit, "even though the underlying factual details and reasoning upon which the opinion is based are not."

DTSC speciously objects to Dr. Lakin's declarations at paragraphs 8–16, 18, 20–24, 26–33, 35, 37 asserting "FRCP 56(e) requires that a declaration contain facts showing personal knowledge of the matter stated in the declaration." Doc. 987 ¶¶ 4–9,10–18,20–28, 30. DTSC cites *to Taylor v. List* for the proposition that a "triable issue is not raised by statements in an affidavit [which is] not made on personal knowledge." 880 F.2d 1040, 1045 n. 3 (9th Cir.1989). *Taylor* is inapplicable. *Taylor* dealt with a plaintiff's *non-expert* affidavit which stated the affiant "was informed and believed" that a certain person was engaging in certain actions. DTSC uses the *Taylor* holding out of context; no such factually deficient declarations are at issue here.

Federal Rule of Evidence 702 states that a qualified expert may testify with opinion or otherwise, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Federal Rule of Evidence 703 states that an expert may rely upon facts or data perceived or known to the expert, at or before the hearing, if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Furthermore, "the facts need not be admissible in evidence in order for the opinion or inference to be admitted." F.R.E. 703.

Dr. Lakin's testimony is based upon facts, data and methodology contained in DTSC's various expert reports, even if hearsay. *See* Doc. 973 ¶ 6. Dr. Lakin's opinions in paragraphs 8–16, 18, 20–24, 26–33, 35, 37 as to the methodology used and conclusions derived by DTSC's experts, including Mr. Kovac, are admissible and create a triable issue of material fact.

DTSC objects to Dr. Lakin's testimony, paragraphs 3 and 4, "to the extent that they purport to qualify Mr. Lakin [sic] as an expert on all of the fields he mentions." Doc. 987 ¶ 1 at 2. Barstow responds that Dr. Lakin lists "his areas of experience in connection with his work as a toxicologist whose practice has focused on environmental issues." Dr. Lakin is entitled to cover the subjects of his declaration.

DTSC objects to Dr. Lakin's testimony, paragraph 5, "to the extent it purports to demonstrate Mr. Lakin's [sic] expertise in the area of meteorology." Doc. 987 ¶ 2 at 2–3. Barstow responds that Dr. Lakin "is providing factual background about his familiarity with the Mojave smelter site and the Mojave area in general." Doc. 1001 at 5. Dr. Lakin does not contend he is an expert in meteorology; objection OVERRULED.

DTSC objects to ¶ 25 "on the grounds of the best evidence rule ... Mr. Lakin [sic] improperly testifies to the contents of the document. The document speaks for itself." Doc. 987 ¶ 19 at 9. DTSC is correct; the objection is sustained. Paragraph 25 of Dr. Lakin's testimony, Doc. 973 at 8, is STRICKEN.

### c. *Barstow's Evidentiary Objections*

### 1. *Objections to Riley Declaration*

a. Barstow objects to ¶ 9 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion.

Objection OVERRULED. Mr. Riley testifies as to his personal experience; he does not render a legal conclusion.

b. Barstow objects to ¶ 10 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion.

Objection OVERRULED in part and SUSTAINED in part. Mr. Riley testifies as to his personal experience. Objection to Mr. Riley's statement, "that definition is identical to the definition set forth in section ... 42 U.S.C. § 9627(d)(3)" is SUSTAINED; it is a legal conclusion.

c. Barstow objects to ¶ 11 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion.

Objection OVERRULED. Mr. Riley testifies in ¶ 11 as to his personal experience.

d. Barstow objects to ¶ 12 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion.

Objection OVERRULED. Mr. Riley testifies in ¶ 12 as to his personal experience.

e. Barstow objects to ¶ 12 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion.

Objection OVERRULED. Mr. Riley testifies as to his personal experience.

f. Barstow objects to ¶ 14 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion. Barstow further objects to this paragraph on the grounds that it lacks proper foundation and improperly calls for speculation.

Objection OVERRULED. Federal Rule of Evidence 702 states that a qualified expert may testify with opinion or otherwise, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably

to the facts of the case." Federal Rule of Evidence 703 states that an expert may reply upon facts or data perceived or known to the expert, at or before the hearing, if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Furthermore, "the facts need not be admissible in evidence in order for the opinion or inference to be admitted." F.R.E. 703.

In ¶ 14, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field."

g. Barstow objects to ¶ 15 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion. Barstow further objects to this paragraph on the grounds that it lacks proper foundation and improperly calls for speculation.

Objection OVERRULED. In ¶ 15, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field."

h. Barstow objects to ¶ 16 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED. In ¶ 16, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field." The best evidence rule is inapplicable. No hearsay is involved in the statement.

i. Barstow objects to ¶ 17 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds of the best evidence rule applies.

Objection OVERRULED. In ¶ 17, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field." His statement is neither made for the truth of the matter asserted nor to prove the contents of the writing; no hearsay is involved. The best evidence rule is inapplicable.

j. Barstow objects to ¶ 18 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds of the best evidence rule applies.

Objection OVERRULED in part and SUSTAINED in part. The first sentence in ¶ 18 is Mr. Riley's expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field." Objection OVERRULED as to the first sentence in ¶ 18. Mr. Riley's statement, "it is my opinion that the solder dross and other dross sent to the Mobile Smelting Site either contained large amounts of lead as unintended ingredient, or contained smaller amounts of lead as a contaminant," is speculative and no basis for the opinion is referenced. Is not based on facts within the record, or data reasonably relied upon by the expert. Objection SUSTAINED as to the second sentence in ¶ 18.

k. Barstow objects to ¶ 19 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds of the best evidence rule applies.

Objection OVERRULED. In ¶ 19, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field." His statement is neither made for the truth of the matter

asserted nor to prove the contents of the writing; no hearsay is involved. The best evidence rule is inapplicable.

*l.* Barstow objects to ¶ 20 on the grounds that Mr. Riley is not qualified to render what calls for legal conclusion. Barstow further objects to this paragraph on the grounds that it lacks proper and foundation and improperly calls for speculation.

Objection OVERRULED in part and SUSTAINED in part. In ¶ 20, Mr. Riley sentence "according to various federal guidance documents, dross and solder dross are not included within the definition of scrap metal under RCRA," is an improper legal conclusion. Objection SUSTAINED as to this part of ¶ 20. Objection OVERRULED as to the remainder of the paragraph. Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field."

m. Barstow objects to ¶ 21 on the grounds that Mr. Riley is not qualified to render what calls for legal conclusion. Barstow further objects to this paragraph on the grounds that it lacks proper and foundation and improperly calls for speculation.

Objection SUSTAINED. Mr. Riley's statement is an improper legal conclusion.

n. Barstow objects to ¶ 22 on the grounds that Mr. Riley is not qualified to render what calls for a legal conclusion. Barstow further objects to this paragraph on the grounds that it lacks proper and foundation and improperly calls for speculation.

Objection OVERRULED Mr. Riley testifies as to his personal experience in ¶ 22; he offers no legal conclusions nor speculations.

*o.* Barstow objects to ¶ 23 on the grounds that it lacks proper foundation and improperly calls for speculation. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED Mr. Riley testifies as to his personal experience and mentions documents upon which he has based his evaluation in accordance with FRCP 702 and 703. Mr. Riley does not testify to prove the contents of the writing, nor does he engage in speculation.

p. Barstow objects to ¶ 24 on the grounds that it lacks proper foundation and improperly calls for speculation and hearsay.

Objection OVERRULED. In ¶ 24, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field." Mr. Riley statement is neither speculative nor hearsay. *See* FRCP 702, 703.

q. Barstow objects to ¶ 25 on the grounds that Mr. Riley is not qualified to render what calls for legal conclusion. Barstow further objects to this paragraph on the grounds that it lacks proper and foundation and improperly calls for speculation and hearsay.

Objection SUSTAINED. In ¶ 25, Mr. Riley offers an improper legal conclusion.

r. Barstow objects to ¶ 26 on the grounds that it lacks proper and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED. In ¶ 26, Mr. Riley provides his expert opinion based on personal knowledge, facts and data "of a type reasonably relied upon by experts in the particular field." Mr. Riley statement is neither speculative nor hearsay; he does

not testify to the contents of the writing. *See* FRCP 702, 703.

### 2. *Objections to Hart Declaration*

Barstow objects to ¶ 9 on the grounds it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED. Mr. Hart's declaration is based on his experience and expertise. Mr. Hart's discussion of DTSC's document does not go to the truth of the matter asserted, nor is it an attempt to prove the contents of a writing. Neither the best evidence rule nor hearsay applies.

### 3. *Objections to Padilla Declaration*

Barstow objects to ¶¶ 5–7 on the grounds they lack proper authentication and foundation, improperly call for speculation and hearsay, and the best of evidence rule applies.

Objections OVERRULED. Mr. Padilla is testifying to matters as to which he has personal knowledge; authentication, speculation and foundation objections do not apply. Padilla is not testifying to the contents of the writings or the truth of the matter asserted, hearsay and best evidence objections do not apply.

### 4. *Objections to Wallberg Declaration*

Barstow objects to ¶ 5 on the grounds it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects in the grounds of the best evidence rule applies.

Objection OVERRULED in part and SUSTAINED in part. Objection as to Mr. Wallberg's declaration, "I am informed and believe that ... made copies of invoices... The invoices documented the types and amount of material ... for the various scrap dealers," is SUSTAINED. Mr. Wallberg's "informed and believe" statement means he has no personal knowledge as to the statement. Objection as to Mr. Wallberg's declaration, "based on my familiarity with the calculations by TetraTech, I believe ... by each scrap dealer," is SUSTAINED. Mr. Wallberg's "informed and believe" statement means he has no personal knowledge as to the statement. Mr. Wallberg does not testify to the truth of the matter asserted; hearsay objection OVERRULED. An expert may rely upon hearsay. Document copies may be used. Best evidence objection OVERRULED. Objection to Mr. Wallberg declaration regarding the contents of invoices is SUSTAINED IN PART under the best evidence rule. That part of the statement which is admissible includes: "the invoices are kept in the department's file at 8800 Cal Center Drive, Sacramento, CA. Attached hereto as Exhibit A are true and correct copies of two of those invoices [ ] that are retained in the department's files." He may state his opinion of what the invoices demonstrate.

### 5. *Objections to Kovac Declaration*

a. Barstow objects to ¶ 5 on the grounds it calls for legal conclusion.

Objection OVERRULED; Mr. Kovac is testifying to his responsibilities and experience and is not offering a legal conclusion.

b. Barstow objects to ¶ 13 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Federal Rule of Evidence 702 states that a qualified expert may testify with opinion or otherwise, "if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles

and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Federal Rule of Evidence 703 states that an expert may reply upon facts or data perceived or known to the expert, at or before the hearing, if "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Furthermore, "the facts need not be admissible in evidence in order for the opinion or inference to be admitted." F.R.E. 703.

Objection OVERRULED. In ¶ 13, Mr. Kovac is providing his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field."

c. Barstow objects to ¶ 14 under the Doctrine of Completeness on the grounds it calls for speculation.

Objection OVERRULED. Mr. Kovac's declaration speaks to that with which he has personal knowledge. The Rule of Completeness, as codified in FRCP 106, states that "when a writing or reported statement or part thereof is introduced by a party, an adverse party may require the introduction at that time of any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." Mr. Kovac discusses DTSC's plan for additional research. The FRCP 106 objection is non-sensical. Obviously, the future work has not yet been done.

d. Barstow objects to ¶ 15 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED; Mr. Kovac provides information in ¶ 15 to show the data upon which he relies to form his expert opinion contained in ¶ 16. He is neither testifying to the truth of the matter asserted nor is he attempting to prove the contents of a writing.

e. Barstow objects to ¶ 16 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED. In ¶ 16, Mr. Kovac provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." See FRCP 702 & 703. The best evidence rule does not apply.

f. Barstow objects to ¶ 17 on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 16, Mr. Kovac provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." See FRCP 702 & 703.

g. Barstow objects to ¶ 19 on the grounds that it lacks proper authentication and foundation and calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies.

Objection OVERRULED. In ¶ 19, Mr. Kovac provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." See FRCP 702 & 703.

h. Barstow objects to ¶ 20 on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 20, Mr. Kovac provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." See FRCP 702 & 703.

i. Barstow objects to ¶ 22 on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 22, Mr. Kovac's statement is based upon his personal knowledge, and he provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." *See* FRCP 702 & 703.

j. Barstow objects to ¶ 23 on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 23, Mr. Kovac's statement is based upon his personal knowledge and he provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." *See* FRCP 702 & 703.

k. Barstow objects to ¶ 23 on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 23, Mr. Kovac's statement is based upon his personal knowledge, and he provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." *See* FRCP 702 & 703.

*l.* Barstow objects to ¶ 25 on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 25, Mr. Kovac provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." *See* FRCP 702 & 703.

m. Barstow objects to ¶ 26 on the grounds that it lacks proper authentication and foundation and improperly calls for speculation and hearsay. Barstow further objects on the grounds that the best evidence rule applies. Barstow objects to

¶ 26 on the grounds that Mr. Kovac is not qualified to render the opinion or it is a legal conclusion.

Objection OVERRULED. In ¶ 26, Mr. Kovac's statement is based upon personal knowledge and provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." *See* FRCP 702 & 703.

n. Barstow objects to ¶ 27 (erroneously labeled as a second ¶ 26) on the grounds that it calls for speculation and lacks foundation.

Objection OVERRULED. In ¶ 27, Mr. Kovac's statement is based upon personal knowledge and provides his expert opinion based on facts and data "of a type reasonably relied upon by experts in the particular field." *See* FRCP 702 & 703.

## V. *CONCLUSION*

A. *Cross motions for Summary Judgment re: the Estate of William Huffman*

For the foregoing reasons, Ohio Casualty's and the California Department of Toxic Substances Control's motion for summary judgment under CERCLA are GRANTED in part and DENIED in part:

1) Ohio Casualty's Motion to Strike DTSC's Motion for Summary Judgment for lack of sufficient notice is DENIED.

2) Motion for Summary Adjudication as to whether Mr. Huffman owned and operated the Mobile Smelting Site between 1963 and 1995 is GRANTED.

3) Motion for Summary Adjudication as to whether or not the Huffman Estate is the current owner of the Mobile Smelting Site is GRANTED.

4) Summary Adjudication as to whether there has been a release of hazardous substances at the Site, as defined by CERCLA, is GRANTED.

5) Summary adjudication as to whether DTSC has incurred costs in responding to the release or threatened release of hazardous substances at the Site is GRANTED.

6) Summary Judgment as to whether the Estate of Huffman is jointly and severally liable under CERCLA, and as to Great American, not to exceed any applicable insurance coverage as provided under Probate Code § 550 and CERCLA, according to proof, is GRANTED. This does not determine the applicability of insurance coverage for the Site.

7) A Declaratory Judgment shall be made that the Huffman Estate is jointly and severally liable, to be paid by Huffman's covered insurance up to a maximum of the applicable insurance coverage, according to proof, for all future response costs at the Site, is GRANTED.

8) Summary Adjudication of additional facts:

> a) The Mobile Smelting Site is a "Facility" within the definition of CERCLA; and,
>
> b) William Huffman owned and operated the Mobile Smelting Site (the Facility) at the time of the hazardous waste disposal.

B) *Third–Party Intervenor/Defendant Barstow Trucking's Motion for Summary Judgment against Plaintiff DTSC under CERCLA*

Barstow Truck Parts and Equipment Company's motion for summary judgment under CERCLA is GRANTED in part and DENIED in part:

1) Summary Adjudication as to Barstow's lack of liability under CERCLA, for transactions with Mobile Smelting which involved insulated copper wire and scrap aluminum and meet CERCLA's § 127 recycling exemption, is GRANTED.

2) Summary Adjudication as to Barstow's lack of liability under CERCLA, for transactions with Mobile Smelting which involved Bottom Ash, is DENIED.

3) Summary Adjudication as to Barstow's lack of liability under CERCLA, for transactions with Mobile Smelting which involved dross, is DENIED.

4) Summary Adjudication as to Barstow's lack of liability under CERCLA, for transactions with Mobile Smelting which involved battery parts, is DENIED.

C) *DTSC Motion for Summary Judgment Against BARSTOW, under CERCLA*

The California Department of Toxic Substances Control's motion for summary judgment under CERCLA is GRANTED in part and DENIED in part:

1. Summary Judgment as to Barstow's liability regarding insulated copper wire and scrap aluminum, which meet CERCLA's § 127 recycling exemption, is DENIED.

2. Summary Adjudication as to Barstow's status as an arranger under CERCLA, with respect to the Bottom Ash is DENIED.

3. Summary Adjudication as to Barstow's status as an arranger under CERCLA, with respect to Barstow's dross related transactions with Mobile Smelting, is DENIED.

4. Summary Adjudication as to Barstow's status as an arranger under CERCLA, with respect to Barstow's battery part related transactions is GRANTED.

5. Summary Adjudication as to whether there has been a release of hazardous

substances at the Site, as defined by CERCLA, is GRANTED.

6. Summary Adjudication as to whether DTSC incurred costs in response to the release or threatened release of hazardous substances at the Site is GRANTED.

7. Summary Judgment as to Barstow's liability with respect to the Bottom Ash is DENIED.

8. Summary Judgment as to Barstow's liability with respect to dross related transactions is DENIED.

9. Summary Judgment as to Barstow's liability, with respect to its battery part transactions is GRANTED.

10. Summary Judgment as to Barstow being joint and severally liable for response costs at the Site is DENIED.

11. Summary Judgment as to Barstow's future liability with respect to the Bottom Ash is DENIED.

12. Summary Judgment as to Barstow's future liability with respect to the dross is DENIED.

13. Summary Judgment requesting a declaratory judgment as to Barstow's future liability for some amount of response costs, with respect to its battery part transactions, is GRANTED.

14. The issue of *joint and several liability,* versus apportioned liability, DENIED and reserved for trial.

15. Motion for Summary Judgment requesting a declaratory judgment as to Barstow's joint and several future liability is DENIED.

D) *DTSC Motion for Summary Judgment Against BARSTOW, under RCRA*

The California Department of Toxic Substances Control's Motion for Summary Judgment against Barstow, under RCRA, is GRANTED in part and DENIED in part:

Summary Adjudication as to the following facts is GRANTED:

1. Scrap Metal is not exempted under the statutory definition of Solid Waste; RCRA's general definition of "solid waste," contained in 42 U.S.C. § 6903(27) applies.

2. CERCLA'S § 127 recycling exemption does not apply to RCRA; there is no recycling exemption in RCRA.

3. Barstow's battery part related transactions are "solid waste" and subject to RCRA.

4. The dross Barstow brought to Mobile Smelting is "solid waste" as defined in 42 U.S.C. 6903(27) and subject to RCRA.

5. Bottom Ash is Solid Waste under RCRA.

6. Barstow is a "past generator ... or transporter of solid or hazardous waste" at the Site under RCRA.

Summary Adjudication as to the following facts is DENIED:

1. Whether Barstow "contributed to" a current ISE at the Site.

2. Whether the Site currently "may present an imminent and substantial endangerment to health or the environment."

E. *DTSC's motion to exclude Dr. Lakin's testimony is DENIED.*

F. *DTSC's objections to Dr. Lakin's testimony are OVERRULED in part and SUSTAINED in part:*

1. DTSC's objections to paragraphs 3–5,7–16,18,20–24,26–33, 35–37 are OVERRULED.

2. DTSC's objection to paragraph 25 is SUSTAINED.

G. *Barstow's evidentiary objections are OVERRULED in part and SUSTAINED in part:*

1. Barstow's objections to the Riley declaration, paragraphs 9, 11, 12, 14–19, 22–24, & 26, are OVERRULED.

2. Barstow's objections to the Riley declaration, paragraph 21 and paragraph 25, are SUSTAINED.

3. Barstow's objection to the Riley declaration, paragraph 10, is SUSTAINED in part and OVERRULED in part:

 a. Objection to Mr. Riley's statement, "that definition is identical to the definition set forth in section... 42 U.S.C. § 9627(d)(3)" is SUSTAINED.

 b. Objection as to the remainder of paragraph 10 is OVERRULED.

4. Barstow's objection to the Riley declaration, paragraph 20, is SUSTAINED in part and OVERRULED in part:

 a. Objection to Mr. Riley's statement, "according to various federal guidance documents, dross and solder dross are not included within the definition of scrap metal under RCRA," is SUSTAINED.

 b. Objection as to the remainder of paragraph 20 is OVERRULED.

5. Barstow's objection to the Hart declaration, paragraph 9, is OVERRULED.

6. Barstow's objections to the Padilla declaration, paragraphs 5–7 are OVERRULED.

7. Barstow's objections to the Walberg declaration, paragraph 5, is SUSTAINED in part and OVERRULED in part:

 a. Objection as to Mr. Walberg's declaration, "I am informed and believe that... made copies of invoices... the invoices documented the types and amount of material... for the very scrap dealers," is SUSTAINED.

 b. Barstow's hearsay objection is OVERRULED.

 c. Barstow's best evidence objection regarding the use of copies is OVERRULED.

 d. Barstow's objection to Mr. Walberg's declaration regarding the contents of the invoices is SUSTAINED IN PART under the best evidence rule. That part of the statement which is ADMISSIBLE includes: "the invoices are kept in the department's file at 8800 Cal Center Drive, Sacramento, CA. Attached hereto as Exhibit A. are true and correct copies of two of those invoices [ ] that are retained in the department's files."

8. ALL of Barstow's objection to the Kovac declaration, (paragraphs 5, 13–17, 19–20, 22, 23, 25–27) are OVERRULED.

SO ORDERED.